KNAPPER v. STATE



 

 
 
 
 
 
 Skip to Main Content
 Accessibility Statement
 
 
 
 
 
 Help
 Contact Us
 
 
 
 
 e-payments
 Careers
 
 
 
 
 
 
 
 
 
 
 
 Home
 Courts
 Decisions
 Programs
 News
 Legal Research
 Court Records
 Quick Links
 
 
 
 
 
 OSCN Found Document:KNAPPER v. STATE

 

 
 



 
 
 
 
 Previous Case

 
 Top Of Index

 
 This Point in Index

 
 Citationize

 
 Next Case

 
 Print Only
 
 
 

 
 KNAPPER v. STATE
2020 OK CR 16
Case Number: F-2017-223
Decided: 08/20/2020
JAMES EDWARD KNAPPER Appellant v. STATE OF OKLAHOMA, Appellee.

Cite as: 2020 OK CR 16, __ __

 

OPINION
HUDSON, JUDGE:
¶1 Appellant, James Edward Knapper, was tried and convicted at a jury trial in Tulsa County District Court, Case No. CF-2015-3957, of Count 1: Murder in the First Degree, in violation of 21 O.S.Supp.2012, § 701.7(A); Count 2: Assault and Battery With a Deadly Weapon, in violation of 21 O.S.2011, § 652; and Count 3: Gang-Related Offense, in violation of 21 O.S.2011, § 856.3. The jury recommended sentences of life imprisonment with the possibility of parole on Count 1; fifty-five years imprisonment on Count 2; and five years imprisonment on Count 3. The Honorable William D. LaFortune, District Judge, presided at trial and sentenced Appellant in accordance with the jury's verdicts. Judge LaFortune gave credit for time served and ordered all three sentences to run consecutively.[1] Appellant now appeals.
FACTS
¶2 In 2015, Jerome Bledsoe was a member of a street gang called the Squeeze Team and a former member of the rival Hoover Crips. The Hoover Crips had marked him for death for leaving their gang. On June 23, 2015, a group of Crips unsuccessfully attempted to assassinate Bledsoe while he was getting gas at a north Tulsa QuikTrip. The shooters unintentionally shot another person during this attack.
¶3 On July 17, 2015, Bledsoe and his girlfriend, Deouijanea Terry, were driving around north Tulsa. Around 3:45 p.m., Bledsoe stopped at an intersection and a gray Chevy Astro van drove up next to them. The van's sliding passenger door opened
[2] and the occupants on the passenger side of the van opened fire, wounding Bledsoe and killing Ms. Terry. Bledsoe later told police that Appellant, a then fourteen-year-old member of the Hoover Crips, was one of the shooters who opened fire. Bledsoe also identified Appellant at trial as a participant in the QuikTrip shooting the month before.
¶4 Appellant and his accomplices later bragged about the shootings to Roshawn Banks, telling Banks they had done some shooting and thought someone had been killed. Appellant also remarked that a ".40 barked harder than a nine." When Appellant learned he was wanted for questioning, he fled Tulsa for Wichita, Kansas, where he was later arrested.
¶5 After the shooting, police recovered a stolen van matching the description of the van used in the July 17th shooting. Latent fingerprints recovered from the window of the van's passenger side sliding door matched Appellant's known fingerprints. Police also recovered a .40 caliber shell casing and two 9mm shell casings from inside the van. The .40 caliber shell casing was recovered from the floor, near the edge of the van's sliding passenger door, behind the front passenger seat. A police ballistics examiner determined the .40 caliber shell casings recovered both from the roadway at the crime scene and from inside the van were fired from the same weapon.
¶6 The State also recovered numerous Snapchat videos of Appellant searching the OSCN online docket and saying that someone was talking to the police. Other Snapchat videos recovered by authorities showed Appellant praising incarcerated gang members and flashing gang signs. Some Snapchat videos too showed Appellant partying while on the run in Wichita.
¶7 Appellant took the witness stand and flatly denied his guilt of the charges, claiming he was not present and took no part in the shootings. Appellant claimed investigators were attempting to frame him by planting his fingerprints to connect him to the van used in the murder. Appellant also denied being a member of a gang.
¶8 Additional facts will be discussed below as necessary.
ANALYSIS
¶9 Proposition I. Appellant first complains that trial counsel was constitutionally ineffective for not attempting to have Appellant certified as a Youthful Offender. To prevail on an ineffective assistance of counsel claim, the defendant must show both that counsel's performance was deficient and that the deficient performance prejudiced his defense. Strickland v. Washington, 466 U.S. 668, 687 (1984). As summarized by the Supreme Court:
To establish deficient performance, a person challenging a conviction must show that "counsel's representation fell below an objective standard of reasonableness." 466 U.S. at 688. A court considering a claim of ineffective assistance must apply a "strong presumption" that counsel's representation was within the "wide range" of reasonable professional assistance. Id., at 689. The challenger's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id., at 687.
With respect to prejudice, a challenger must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id., at 694. It is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." Id., at 693. Counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id., at 687.
Harrington v. Richter, 562 U.S. 86, 104 (2011) (quoting Strickland, supra).
¶10 Appellant fails to show that trial counsel was ineffective. Oklahoma law provides that:
Any person thirteen (13) or fourteen (14) years of age who is charged with murder in the first degree shall be held accountable for the act as if the person were an adult; provided, the person may be certified as a youthful offender . . . as provided by this section[.]
10A O.S.2011, § 2-5-205(A). Appellant was fourteen years old when he and his accomplices opened fire on Deouijanea Terry and Jerome Bledsoe. He was presumed to be an adult under Oklahoma law when the charged offenses were committed. Consistent with this understanding, the State charged Appellant as an adult in this case.
¶11 At a reverse certification hearing, it is the defendant's burden to overcome this presumption and prove he or she should be certified as a youthful offender. C.L.F. v. State, 1999 OK CR 12, ¶ 4, 989 P.2d 945, 946. In order to demonstrate youthful offender status, the district court must consider a statutorily-delineated list of seven factors with the greatest weight being given to the first three factors:
1. Whether the alleged offense was committed in an aggressive, violent, premeditated or willful manner;
2. Whether the offense was against persons, and, if personal injury resulted, the degree of personal injury;
3. The record and past history of the accused person, including previous contacts with law enforcement agencies and juvenile or criminal courts, prior periods of probation and commitments to juvenile institutions;
4. The sophistication and maturity of the accused person and the capability of distinguishing right from wrong as determined by consideration of the person's psychological evaluation, home, environmental situation, emotional attitude and pattern of living;
5. The prospects for adequate protection of the public if the accused person is processed through the youthful offender system or the juvenile system;
6. The reasonable likelihood of rehabilitation of the accused person if such person is found to have committed the alleged offense, by the use of procedures and facilities currently available to the juvenile court; and
7. Whether the offense occurred while the accused person was escaping or on escape status from an institution for youthful offenders or delinquent children.
10A O.S.2011, § 2-5-205(E)(1-7). 
¶12 Appellant offers no argument on appeal addressing these factors, let alone discussing how defense counsel could reasonably craft an argument utilizing these factors to overcome the presumption that he was an adult when he and his accomplices opened fire on Bledsoe and Terry in broad daylight at a busy north Tulsa intersection. The record shows, inter alia, that these were exceptionally violent and aggressive crimes; that the drive-by shooting resulting in the murder was gang-motivated; that Appellant had participated in a previous drive-by shooting aimed at killing Bledsoe the month before at a QuikTrip; and that Appellant had prior contacts with law enforcement as a juvenile for weapons offenses including felony discharge of a firearm into a dwelling. Appellant's own mother acknowledged during her sentencing phase testimony that Appellant could not make it longer than two or three months at a time as a juvenile before getting back into trouble with authorities. The first three factors of the statutory analysis counsel strongly in favor of adult status in the present case for Appellant. Nothing in the record on appeal suggests the balance of factors prescribed in § 2-5-205(E) offset the first three factors to overcome the presumption that Appellant should have been charged as an adult.
¶13 Instead of addressing the factors relevant to this proposition, Appellant focuses largely on trial counsel's performance during closing argument at trial--an issue separately raised and addressed in Proposition IX, infra. This is wholly insufficient, however, to overcome the strong presumption that counsel's representation was within the wide range of reasonable professional assistance concerning his decision not to seek youthful offender status for Appellant. Nor does Appellant demonstrate Strickland prejudice with this claim. Appellant's claim that trial counsel was ineffective for failing to file a motion to certify Appellant as a youthful offender is, at best, speculative and conclusory. This is wholly inadequate to demonstrate ineffective assistance under the two-pronged Strickland standard. See Fulgham v. State, 2016 OK CR 30, ¶ 18, 400 P.3d 775, 780-81. Proposition I is denied.
¶14 Proposition II. Appellant complains his constitutional right to confrontation was violated from the reading at trial of preliminary hearing testimony for an unavailable witness. The record shows prosecution witness Roshawn Banks was declared unavailable by the trial court, at the State's request, on the second day of trial. The State read Banks's testimony to the jury pursuant to 12 O.S.Supp.2014, § 2804(B)(1). Appellant complains the trial court erred in allowing Banks's preliminary hearing testimony to be read into evidence at trial. Appellant says this violated his Sixth Amendment confrontation right. See U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ."). Appellant argues 1) the State failed to make an adequate showing that Banks was unavailable; and 2) the defense did not have an adequate opportunity at preliminary hearing to develop Banks's testimony on cross-examination. Appellant also complains the trial court failed to read for the jury the cross-examination of Banks conducted at the preliminary hearing by Appellant's codefendants.
¶15 Background. On February 10, 2017, the Friday before Appellant's trial was set to begin, the State filed a motion to declare Banks unavailable and to read his preliminary hearing testimony to Appellant's jury. In this motion, the State argued Appellant had an opportunity and similar motive to develop Banks's testimony on cross-examination through counsel at the preliminary hearing and that the State had been unable to procure Banks's appearance for trial. The State explained Banks had four separate pending felony matters set before Tulsa County District Judge Kelly Greenough and that Banks failed to appear for a status conference in those cases on February 8, 2017. The State wrote that Judge Greenough thereafter revoked Banks's personal recognizance bond and issued hold-without-bond arrest warrants for Banks. The State represented that, prior to issuance of these bench warrants, Banks "had been in steady contact with the State and was aware of the fact that he is a material witness [both] in this case" and for the jury trial set to begin on February 13, 2017. The State wrote too that Banks's location was unknown and Banks had expressed that he would no longer cooperate with the State.
¶16 During an in camera hearing held on the second day of trial, defense counsel contested only the State's assertion that Banks was unavailable. Defense counsel conceded he previously had an adequate opportunity at preliminary hearing to cross-examine Banks. The State presented testimony from Ivan Orndorff, Banks's attorney, to show Banks was unavailable. Orndorff confirmed that: he was Banks's retained counsel in the pending felony matters before Judge Greenough; Orndorff had kept in contact both with Banks and Banks's family during those cases; Banks had expressed concern for his personal safety if he appeared as a witness in Appellant's case; Banks was at risk of personal retaliation because of his prior gang affiliations and his status as a prosecution witness; Orndorff had met with Banks discreetly and covertly in the past because of the threat of gang retaliation; and Banks had obtained a personal recognizance bond from Judge Greenough so he could bond out, get away from other gang members in the county jail who were threatening his life and be restricted to home confinement with his family in Tulsa.
¶17 Orndorff explained that Judge Greenough modified the conditions of Banks's personal recognizance bond after four individuals attempted to break into the Banks family home at 2 a.m. with weapons visible. Due to this event, Banks and his family were scared for their lives if they stayed in Tulsa. Under the modified bond conditions, Appellant was allowed to move to Texas with his family. According to Orndorff, Banks had generally complied with the requirements of his bond. Banks last appeared before Judge Greenough on January 13, 2017, and was recognized back for court on February 8th. When Banks appeared for the January 13th hearing, he had changed his appearance in an effort to preserve his safety. Banks also appeared on that date in the courtroom with one of his sisters. During the January 13th hearing, Banks was specifically instructed to return to court not only for the February 8th hearing but also for Appellant's trial.
¶18 Orndorff had contact with Banks prior to the February 8th hearing. By this point, the State had made known to Orndorff that it was going to move to revoke Banks's bond and return him to custody; the State had become aware Banks had been arrested for several crimes he had committed in the previous three months in Oklahoma.
[3] When Orndorff informed Banks of the State's desire to revoke his bond, Banks "was upset and very scared for his safety." Orndorff had several conversations with Banks in an attempt to reassure him that if he was taken back into custody, Banks's safety "would be of the utmost importance and that we would do what we could to make sure that . . . he was safe." Orndorff communicated to Banks only that his bond may be revoked, not that it definitely would be.
¶19 Banks did not appear in Judge Greenough's courtroom on February 8th as previously ordered. This despite Banks's sister, Erica, appearing at the hearing and expressing to Orndorff her belief that Banks would appear. Erica attempted to make telephone contact with Banks when he did not appear. After this call, Erica suddenly and unexpectedly left the courthouse without saying goodbye to Orndorff. Orndorff attempted to make contact with Banks via text message after the February 8th hearing to see if he was coming to court. Orndorff received no reply from Banks. Orndorff also communicated with Banks's family who remained in Texas. Orndorff believed Banks was aware of the bench warrants issued for his arrest by Judge Greenough. It was Orndorff's understanding Banks did not intend to appear for court. When asked whether he would characterize Banks as refusing to testify, Orndorff responded "Yes, probably so." Orndorff offered too that he did not have a current address for Banks and did not know whether Banks was even in Tulsa. Banks's family too did not know where he was. Orndorff expressed his belief the State would not be able to procure Banks's testimony for Appellant's jury trial.
¶20 During the hearing, the parties and trial court discovered bench warrants had been authorized by Judge Greenough for Banks's arrest but had not yet been issued by the clerk. The prosecutor expressed his surprise that the bench warrants had not yet been issued. Orndorff too was unaware of this development and was informed subsequent to the February 8th hearing that several officers with the Tulsa Police Department stopped by the home of one of Banks's relatives looking for him. The prosecutor added that Tulsa Police had gone to the relatives' home the previous weekend because they believed, based upon information obtained from a confidential informant, that Banks was part of a group planning to commit a new crime. The State said the police and prosecutors were operating under the assumption Banks had four outstanding bench warrants. The prosecutor offered too that he "had no doubt in his mind whatsoever that the . . . warrants were unequivocal from Judge Greenough."
¶21 The prosecutor made an offer of proof that he had discussed with Banks at the January court date that it was imperative for Banks to come to court, not commit new crimes and that he, Banks, was expected to testify at Appellant's February trial. According to the prosecutor, Banks affirmatively stated that he understood. The prosecutor represented that he had personally contacted Banks's family members on February 8th and talked to them about the imperative nature of encouraging Banks to surrender to authorities.
¶22 Based on this testimony, Judge LaFortune found Banks was an unavailable witness for purposes of 12 O.S.Supp.2014, § 2804(A)(5) and accepted defense counsel's acknowledgement that he had an adequate opportunity to cross-examine Banks at the preliminary hearing. Judge LaFortune requested, however, the State contact Judge Greenough and arrange for Banks's bench warrants to be issued to the sheriff so the warrant squad could attempt to find him. The record shows Judge Greenough's clerk issued the bench warrants for Banks later that same day. Judge LaFortune also signed a material witness warrant for Banks at that time.
¶23 Prior to reading Banks's testimony to the jury, the State presented to the trial court an agreed-upon redacted version of Banks's preliminary hearing testimony for use at the trial. The redacted version of Banks's testimony was made part of the record as Court's Exhibit 1. The redactions included the omission of the cross-examination conducted by Appellant's codefendants. When Banks's redacted testimony was read to the jury, defense counsel registered no contemporaneous objection.
¶24 Standard of Review. Appellant's failure to make a contemporaneous objection to the reading of Banks's testimony limits our review of this claim to plain error. See Van White v. State, 1999 OK CR 10, ¶ 51, 990 P.2d 253, 268. To show plain error, Appellant must show an actual error, which is plain or obvious, affected his substantial rights. "This Court will only correct plain error if the error seriously affects the fairness, integrity or public reputation of the judicial proceedings or otherwise represents a miscarriage of justice." Lamar v. State, 2018 OK CR 8, ¶ 40, 419 P.3d 283, 294. See also 20 O.S.2011, § 3001.1.
¶25 Analysis. Appellant fails to show actual or obvious error with this claim. The accused in a criminal prosecution has a constitutional right to cross-examine the witnesses against him. See Crawford v. Washington, 541 U.S. 36, 61--62 (2004); U.S. Const. amend. VI; Okla. Const. art. 2, § 20. The Supreme Court held in Crawford that the Confrontation Clause prohibits the admission of testimonial hearsay unless 1) the witness is unavailable; and 2) the defendant had a prior opportunity to cross-examine the witness. Crawford, 541 U.S. at 68; Willis v. State, 2017 OK CR 23, ¶ 14, 406 P.3d 30, 34. Preliminary hearing testimony is testimonial hearsay subject to Crawford's mandate. Willis, 2017 OK CR 23, ¶ 14, 406 P.3d at 34; Thompson v. State, 2007 OK CR 38, ¶ 20, 169 P.3d 1198, 1205.
¶26 Appellant contends the State was not diligent in its efforts to secure Banks's appearance and, thus, Banks was not an unavailable witness. Under Oklahoma law, a witness is unavailable when he or she "[i]s absent from the hearing and the proponent of the declarant's statement has been unable to procure the declarant's attendance[.]" 12 O.S.Supp.2014, § 2804(A)(5). The proponent of the former testimony "must show that a diligent effort has been made to locate the missing witness and that the witness is actually unavailable." Ybarra v. State, 1987 OK CR 31, ¶ 11, 733 P.2d 1342, 1345. Stated another way, prior testimony is admissible under this rule if the witness is unavailable "despite good faith and due diligence of the party calling the witness[.]" Clearly v. State, 1997 OK CR 35, ¶ 16, 942 P.2d 736, 744. On appeal, "we look to all the relevant facts of the case, and issuance of a subpoena is not the sine qua non of good faith and due diligence." Id., 1997 OK CR 35, ¶ 18, 942 P.2d at 744.
¶27 Our decisions on the unavailability of a witness are based on the Supreme Court's pronouncements for this issue. See, e.g., Munson v. State, 1988 OK CR 124, ¶ 29, 758 P.2d 324, 333. The Tenth Circuit recently summarized those decisions, which are instructive for present purposes:
The clearly established Supreme Court law for unavailability claims like the one here is found in Ohio v. Roberts, 448 U.S. 56 (1980), and Barber v. Page, 390 U.S. 719 (1968). See Hardy v. Cross, 565 U.S. 65, 69-70 (2011) (per curiam) (citing Roberts and Page as the clearly established federal law in an AEDPA case about an unavailable witness). These decisions teach that "[a] witness is not 'unavailable' for purposes of the . . . exception to the confrontation requirement unless the prosecutorial authorities have made a good-faith effort to obtain [her] presence at trial." Roberts, 448 U.S. at 74 (quoting Barber, 390 U.S. at 724-25). "The lengths to which the prosecution must go to produce a witness is a question of reasonableness." Id. (internal quotation marks omitted). "The ultimate question is whether the witness is unavailable despite good-faith efforts undertaken prior to trial to locate and present that witness." Id.
"One, in hindsight, may always think of other things" the prosecution could have done. Id. at 75. But "[t]he law does not require the doing of a futile act." Id. at 74. "Thus, if no possibility of procuring the witness exists . . . , 'good faith' demands nothing of the prosecution." Id. If, however, "there is a possibility, albeit remote, that affirmative measures might produce the declarant, the obligation of good faith may demand their effectuation." Id. 
Acosta v. Raemisch, 877 F.3d 918, 927 (10th Cir. 2017) (emphasis in original).
¶28 The record in the present case shows the State conducted a reasonable, good-faith effort to obtain Banks's appearance at trial. The State maintained contact with Banks, Banks's attorney and Banks's family up through the January 13, 2017 hearing held in Banks's pending felony cases. It was at this hearing that Banks personally appeared and was informed by the prosecutor of the necessity for him to not commit additional crimes, to appear for court and to testify at Appellant's upcoming jury trial. Banks stated that he understood. The record shows Banks originally was a cooperative (albeit reluctant) witness in the State's prosecution of Appellant. Perhaps this was because of the prosecutor's efforts to secure the safety of Banks and his family. Banks acknowledged too in his preliminary hearing testimony that he was hoping for consideration from the State on his felony cases because of his testimony.
¶29 Regardless, Banks disappeared when notified by his own counsel that the State intended to seek revocation of his bond. Judge Greenough authorized bench warrants for Banks's arrest based upon his failure to appear at the February 8th hearing. By that point, neither Banks's attorney nor apparently his family knew of his whereabouts. The prosecutor contacted Banks's family members and told them it was imperative they encourage Banks to surrender to authorities. Even Banks's defense attorney was unable to make contact with his client by text message and Banks's own family was concerned for his safety. Finally, Tulsa Police searched for Banks the weekend before Appellant's trial began in an unsuccessful effort to arrest him.
¶30 Appellant complains the State was not diligent because it did not ensure the bench warrants for Banks's arrest had been issued by Judge Greenough's clerk. Appellant complains too that the State should have obtained a material witness warrant to secure Banks's appearance earlier in the process. Appellant ignores, however, that both the State and the police were unaware the bench warrants had not actually been issued by Judge Greenough's clerk and proceeded as though there were active warrants for Banks's arrest. Moreover, the bench warrants and material witness warrant were formally issued on the second day of Appellant's trial. It was reasonable for the State not to seek a material witness warrant for Banks earlier in the process because of his apparent cooperation. Further, the record does not suggest the State would have obtained Banks's appearance had it moved faster in securing a material witness warrant after Banks's arrest for the new crimes shortly before the February 8th hearing.
¶31 "The Sixth Amendment does not require the prosecution to exhaust every possible means of producing a witness at trial." Acosta, 877 F.3d at 930. Where, as here, the record shows there was no possibility of procuring the witness even had these additional efforts been taken, there was no actual or obvious error from the trial court's ruling that the State made a diligent, good-faith effort to produce this witness. See Davis v. State, 1988 OK CR 73, ¶ 11, 753 P.2d 388, 392 (State's failure to subpoena cooperating out-of-state witness who at the last minute deliberately made himself unavailable did not evidence lack of good faith and due diligence where prosecutor relied in good faith on the witness's repeated assurances that he would voluntarily appear); Rogers v. State, 1986 OK CR 104, ¶¶ 9-10, 721 P.2d 820, 823 (prosecutor's failure to utilize Uniform Act to secure the attendance of an out-of-state witness alone does not amount to lack of diligence; "the State must also fail to make a good faith effort to secure the witness"); Rushing v. State, 1984 OK CR 39, ¶ 50, 676 P.2d 842, 851 (holding the State adequately established witness's unavailability where prosecutor's subpoena at witness's last known address in Texas was returned unserved and the witness's Texas probation officer said she could not be found); Poe v. Turner, 490 F.2d 329, 331 (10th Cir. 1974) ("A good faith search does not mean that every lead, no matter how nebulous, must be tracked down to the ends of the earth[.]"). There was no error, and thus no plain error, from the trial court's ruling that Banks was an unavailable witness.
¶32 We find too that Appellant had an adequate opportunity and similar motive to develop Banks's prior testimony through cross-examination at the preliminary hearing. Title 12 O.S.2011, § 2804(B)(1) provides in pertinent part:
The following are not excluded by the hearsay rule if the declarant is unavailable as a witness . . . Testimony given as a witness at another hearing of the same or another proceeding . . . if the party against whom the testimony is now offered . . . had an opportunity and similar motive to develop the testimony by direct, cross or redirect examination[.]
Defense counsel Brian Martin represented Appellant at both preliminary hearing and trial. The record shows defense counsel's cross-examination of Banks was full and substantial. This is not a case where defense counsel was shut down by the magistrate in any significant respect. The record shows "[d]efense counsel had ample opportunity to develop and challenge [Banks's] testimony about the central facts of what happened, as well as [his] credibility and potential bias in this regard." Thompson, 2007 OK CR 38, ¶ 22, 169 P.3d at 1206.
¶33 Defense counsel's cross-examination was not prejudiced by the limited nature of preliminary hearings under Oklahoma law--a common complaint of criminal defendants challenging the use of such testimony at trial and one used here by Appellant. First, this is not a case where the magistrate terminated the hearing and entered a bindover order. See 22 O.S.2011, § 258(6). Rather, defense counsel's cross-examination of Banks was full and substantive. Second, we have approved the use of an unavailable witness's preliminary hearing testimony under circumstances similar to those presented here. Such testimony is made under oath, in the truth-inducing atmosphere of a courtroom, where the defendant is represented by defense counsel who had "ample opportunity to cross examine" the witness. Thompson, 2007 OK CR 38, ¶ 23, 169 P.3d at 1206 (internal quotation omitted). These factors generally make preliminary hearing testimony an adequate substitute for the defendant's right to cross-examine the witnesses against him at trial when a witness becomes unavailable for trial. Id., 2007 OK CR 38, ¶ 24, 169 P.3d at 1206.
¶34 Appellant's complaint that "[e]ffective cross-examination of the kind we expect in a jury trial setting cannot occur at preliminary hearing[,]" is half-baked at best. Appellant suggests the State's post-hearing discovery would have altered his cross-examination of Banks but fails to show how. Defense counsel may well have questioned Banks differently at trial. But it is likely so too would the State. Preliminary hearing testimony, however, need not be equivalent to trial testimony in every respect before it can be used as an adequate substitute for live testimony at trial. "[T]he Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." Delaware v. Fensterer, 474 U.S. 15, 20 (1985) (emphasis in original). The question for present purposes is simply whether Appellant had an adequate opportunity for cross-examination, not the line of questioning that would have occurred at trial with the benefit of hindsight. Prior testimony is admissible so long as the defendant was not "significantly limited" in his cross-examination. This despite the fact that a preliminary hearing "is ordinarily a less searching exploration into the merits of a case than a trial[.]" California v. Green, 399 U.S. 149, 165-66 (1970) (citing Barber v. Page, 390 U.S. 719, 725-26 (1968)). See Thompson, 2007 OK CR 38, ¶ 25, 169 P.3d at 1207 ("[A]n unfair or distorting constriction of defense counsel's cross examination of key State witnesses could result in a violation of the Sixth Amendment, whether that unjustified constriction occurs during a trial or during preliminary hearing that is later introduced into evidence at trial.").
¶35 Here, defense counsel was not "significantly limited in any way in the scope or nature of his cross-examination of the witness . . . at preliminary hearing." Green, 399 U.S. at 166. Appellant fails to show error, and thus there is no plain error, from the trial court's acceptance of defense counsel's acknowledgement below that Appellant had an adequate opportunity to cross-examine Banks at the preliminary hearing.
¶36 Appellant's complaint that reversible error occurred because of the redactions made to Banks's testimony before it was read to the jury also does not show actual or obvious error. The record shows the parties redacted from Banks's testimony defense objections made by Appellant's codefendants. Also, the parties did not read to the jury the cross-examination of Banks conducted by Appellant's codefendants and a small number of questions (and corresponding answers) made during the prosecutor's redirect examination that directly correlated to cross-examination questions posed by Appellant's codefendants.
¶37 We find no error. Appellant could have demanded the omitted portions of Banks's testimony be read to the jury under the rule of completeness. See 12 O.S.2011, § 2107 ("When a record or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other record that should in fairness be considered contemporaneously with it."). He did not. This alone shows no error on the district court's part. Davis v. State, 1994 OK CR 72, ¶ 21, 885 P.2d 665, 670. Further, Appellant provides no authority to show his right to confrontation hinges on the questions and answers elicited during the cross-examination of this witness by his codefendants, let alone the objections made by those codefendants, most of which were overruled by the trial court. We have reviewed the omitted cross-examination by Appellant's codefendants and find its omission did not deprive Appellant of a fair trial in violation of due process or otherwise deprive Appellant of his right to confrontation. Because there was no error, there is no plain error. Proposition II is denied.
¶38 Proposition III. Appellant contends trial counsel was ineffective for failing to present "readily available" evidence in support of his objection to Banks's unavailability as a witness that he argues would have showed bad faith and a lack of diligence by the State. Notably, Appellant does not discuss this "readily available" evidence in his third proposition of error which spans roughly two pages. Instead, Appellant makes conclusory accusations against both the prosecutor and Judge Greenough in his brief in chief then incorporates by reference the first proposition of his application for evidentiary hearing filed pursuant to Rule 3.11(B), Rules of the Oklahoma Court of Criminal Appeals, Title 22, Ch.18, App. (2020). This portion of Appellant's Rule 3.11 application contains twelve pages of argument for this claim addressing both the Strickland standard and the corresponding non-record evidence which is attached. Notably, Appellant does not apply the less-onerous standard governing this claim, i.e., whether the application and affidavits contain sufficient evidence to show by clear and convincing evidence there is a strong possibility trial counsel was ineffective for failing to utilize or identify the complained-of evidence. Rule 3.11(B)(3)(b)(i), Rules of the Oklahoma Court of Criminal Appeals, Title 22, Ch.18, App. (2020); Simpson v. State, 2010 OK CR 6, ¶ 53, 230 P.3d 888, 905-06.
¶39 Appellant's full argument in support of this ineffectiveness claim should have been raised in his brief in chief. See Rule 3.5(A)(5), Rules of the Oklahoma Court of Criminal Appeals, Title 22, Ch.18, App. (2020) (requiring the brief of appellant to include "[a]n argument, containing the contentions of the appellant, which sets forth all assignments of error, supported by citations to the authorities, statutes and parts of the record"); Rule 3.11(B)(3)(b), supra ("The proposition of error relating to ineffective assistance of trial counsel can be predicated on either allegations arising from the record or outside the record or a combination thereof."). Instead, he makes a general claim in his brief in chief for this proposition, then goes into the specific argument and details for this issue in his application for evidentiary hearing. Appellant's approach violates our Rules. Garrison v. State, 2004 OK CR 35, ¶ 131 n.36, 103 P.3d 590, 612 n.36. Accord Harris v. State, 2019 OK CR 22, ¶ 74 n.33, 450 P.3d 933, 960 n.33 ("We have long looked with disfavor on attempts to evade page-limitation requirements for briefs . . . by incorporating arguments made in this manner.") (citing Garrison, supra). Appellant's third proposition is thus waived from appellate review.
¶40 Alternatively, we review this claim for purposes of determining whether an evidentiary hearing is warranted. Simpson, 2010 OK CR 6, ¶ 53, 230 P.3d at 905-06. Appellant fails to show by clear and convincing evidence a strong possibility that trial counsel was ineffective for failing to utilize the non-record evidence. Appellant has attached docket sheets and other purported records showing Banks's history of failing to appear in his pending felony cases and Judge Greenough's failure to issue bench warrants for Banks's arrest on these occasions. Appellant ignores, however, that the trial court reviewed during the in camera hearing the docket sheet for one of Banks's pending felony cases, CF-2016-599. Judge LaFortune also questioned Banks's defense attorney and the prosecutor concerning Banks's appearances and failure to appear, Banks's arrest on new charges and the history of continuances in that particular case. Further, the prosecutor and Banks's defense attorney both advised the trial court that Judge Greenough took protective measures concerning the public docket entries in Banks's pending cases in an effort to conceal his movement in and out of the courthouse. As discussed in Proposition II, the trial court too was fully apprised of the reasons for Banks's personal recognizance bond.
¶41 Utilizing this and other information elicited at the in camera hearing, defense counsel argued the State was not diligent because the prosecutor was aware in advance of the issues surrounding Banks appearing as a witness at trial. This included Banks's arrest for new crimes while on a personal recognizance bond. Defense counsel too cited the prosecutor's failure to secure a material witness warrant for Banks and to ensure Judge Greenough's bench warrants actually issued as grounds for arguing the State was not diligent. Additional docket entries from Banks's other three pending felony cases offers little in the way of useful information beyond that already presented to the trial court. We therefore deny Appellant's request for an evidentiary hearing on this ineffectiveness claim. Appellant fails to show by clear and convincing evidence there is a strong possibility trial counsel was ineffective for failing to use this information. Proposition III is denied.
¶42 Proposition IV. Appellant contends in his fourth proposition of error that trial counsel was ineffective for failing to utilize available evidence to demonstrate that counsel did not have an adequate opportunity to cross-examine Banks at preliminary hearing. None of this information is contained in the record. Instead, it is contained in Appellant's Rule 3.11 application. Appellant argues in his brief in chief that this information consisted of: 1) evidence concerning Banks's pending felony cases, the special treatment Banks received in exchange for his cooperation as a State's witness and his expectation of leniency from the State in return; and 2) statements made by Banks during his interview with police.
¶43 As in Proposition III, Appellant presents this claim only generally in his brief in chief and incorporates the extended argument set forth in his Rule 3.11 application to fill in the details and present his actual claim. This violates our Rules. Appellant's fully-developed argument in support of this ineffectiveness claim should have been raised in the brief in chief. Appellant's brief, however, already contains roughly fifty pages of argument. Appellant may not evade the page limitations for his brief through incorporation by reference of the extensive arguments set forth in the application for evidentiary hearing. See Rules 3.5(A)(5) and 3.11(B)(3)(b), Rules of the Oklahoma Court of Criminal Appeals, Title 22, Ch.18, App. (2020); Harris, 2019 OK CR 22, ¶ 74 n.33, 450 P.3d at 960 n.33.
¶44 This claim is thus waived from appellate review. Alternatively, Appellant does not show by clear and convincing evidence a strong possibility that defense counsel was ineffective for failing to utilize the tendered non-record evidence concerning Banks's prior statements and pending felony cases. Appellant theorizes that the non-record evidence tends to impeach Banks's credibility by showing bias and motivation to lie. The jury, however, was read Banks's testimony on direct examination in which he acknowledged both having pending criminal matters in Tulsa County and being represented by an attorney. Banks testified too that while he had not received any promises from the State in exchange for his testimony, he nonetheless was hoping the prosecutor would give him consideration for his testimony. On cross, defense counsel elicited that Banks had prior felony convictions in Tulsa County for feloniously pointing a firearm and possession of a stolen vehicle. Banks also admitted on cross that he spoke with police about Appellant after committing the crimes for which he was in custody at the time of the preliminary hearing. Banks admitted speaking with the prosecutor before coming to court but denied having a conversation with the State about coming up with money for bond. The additional details concerning Banks's pending charges do not undermine the adequacy of counsel's cross-examination of Banks at preliminary hearing.
¶45 Appellant's complaint that trial counsel did not utilize portions of Banks's statement to police to challenge the adequacy of Banks's cross-examination also does not warrant an evidentiary hearing. Appellant simply offers his take on Banks's statement, but little in the way of evidence suggesting defense counsel did not have an adequate opportunity to cross-examine this witness. Notably, Appellant's jury heard more details at trial about Banks's background from the State's gang expert, Tulsa Police Sergeant Sean Larkin. Sgt. Larkin told the jury about Banks's gang affiliation and how Banks was "well known as being a thief" who also had been involved in numerous shootings both as a suspect and a victim. Sgt. Larkin observed too that Banks had cooperated with authorities in past investigations and had testified against members of his own street gang, including the preliminary hearing in Appellant's case. The jury in this case was fully informed of the same credibility and bias issues surrounding Banks's testimony that Appellant attempts to extract from Banks's police interview. Appellant fails to show by clear and convincing evidence a strong possibility that counsel was ineffective in his challenge to the State's motion to use Banks's testimony at trial. An evidentiary hearing is unnecessary for this ineffectiveness claim. Proposition IV is denied.
¶46 Proposition V. Appellant claims the prosecutor presented false testimony from Jerome Bledsoe and Detective White that Bledsoe, during his police interview, identified Appellant as one of the QuikTrip shooters. Appellant argues trial counsel was ineffective for failing to refute this testimony using Bledsoe's videotaped interview. The recording of Bledsoe's interview is not part of the record on appeal so Appellant attaches it as an exhibit to his Rule 3.11 application. Rule 3.11 Appl., Exs. J & K. Appellant argues the video shows Bledsoe did not identify Appellant as one of the QuikTrip shooters and that trial counsel should have raised that fact to challenge the credibility of both Bledsoe and Det. White at trial.
¶47 We have thoroughly reviewed Bledsoe's videotaped police interview along with the two-page excerpt from Det. White's supplemental report which is also attached as an exhibit to Appellant's application for evidentiary hearing. Rule 3.11 Appl., Ex. L. We conclude Appellant has failed to show by clear and convincing evidence a strong possibility that trial counsel was ineffective for failing to utilize this evidence in the manner now envisioned.
¶48 The video shows Bledsoe contradicted himself during the interview concerning the identity of the perpetrators involved in both drive-by shootings. We observe too that defense counsel extensively referenced the interview video during Bledsoe's cross-examination and was clearly familiar with it. Appellant's counsel elicited on cross how Bledsoe repeatedly denied during the interview knowing who shot at him during the July 17th drive-by shooting that resulted in Ms. Terry's death. Defense counsel also inquired about threatening statements and actions by the detectives during the interview towards Bledsoe to suggest his identification of Appellant was coerced.
[4] Defense counsel elicited that Bledsoe never told anybody Appellant was part of the group that shot at him at the QuikTrip until after he went in to interview with the detectives. And Bledsoe acknowledged on cross that the surveillance video of the QuikTrip shooting introduced by the State did not show the faces of his attackers.
¶49 Under the total circumstances, we find that defense counsel skillfully utilized Bledsoe's interview with police to attack this witness's credibility. The jury was made fully aware on cross that Bledsoe repeatedly denied during the interview knowing the identity of the perpetrators of the July 17th drive-by shooting. The jury was also aware Bledsoe declined to formally identify anyone in connection with the QuikTrip shooting prior to his police interview in connection with the July 17th drive-by shooting. Defense counsel used his cross-examination to suggest Bledsoe's identification of Appellant as being involved in both drive-by shootings was the product of police coercion and threats made by the detectives during the interview. Even if counsel could have done more to impeach this witness using the interview video, the State's physical evidence independently connected Appellant with the van used in the drive-by shooting of Bledsoe and Terry thus bolstering Bledsoe's overall identification testimony relating to the charged crimes. Under these circumstances, Appellant fails to show by clear and convincing evidence a strong possibility of ineffective assistance based on counsel's total performance. Proposition V is denied. 
¶50 Proposition VI. Appellant contends the State intentionally misled the jury using the purported false testimony from Bledsoe and Det. White discussed in Proposition V and, thus, his conviction was obtained by the prosecutor with knowingly false evidence. See Giglio v. United States, 405 U.S. 150, 153 (1972); Napue v. Illinois, 360 U.S. 264, 269 (1959); Mooney v. Holohan, 294 U.S. 103, 112 (1935). The factual basis for this claim is non-record evidence. Because Appellant never raised this issue before the district court, it is not supported by the record and is not properly before this Court on appeal.
[5] Boone v. State, 1982 OK CR 23, ¶ 8, 640 P.2d 1377, 1379. The exhibits filed in support of the request for an evidentiary hearing on Appellant's related Proposition V ineffectiveness claim are not, by reason of their filing, considered part of the record. Fuston v. State, 2020 OK CR 4, ¶ 57, __P.3d__. Because we have denied an evidentiary hearing for Appellant's ineffective assistance of counsel claim based on this same evidence, the present claim is waived from appellate review. Lamar, 2018 OK CR 8, ¶ 42, 419 P.3d at 295 (supplementation of the record under Rule 3.11 "is not appropriate merely to cure a defendant's failure to preserve an issue below"). See Rule 3.11(B)(3)(b), Rules of the Oklahoma Court of Criminal Appeals, Title 22, Ch.18, App. (2020); Day v. State, 2013 OK CR 8, ¶ 10, 303 P.3d 291, 297. Proposition VI is denied.
¶51 Proposition VII. Appellant next challenges the admission of what he describes as improper other crimes or bad acts evidence. Appellant takes issue here with the following categories of evidence: 1) evidence of the June 23, 2015, QuikTrip shooting; and 2) the State's impeachment of Appellant on cross-examination using evidence of [a] his prior juvenile offenses, [b] the gang graffiti on the walls of his jail cell, [c] his fights with other inmates and [d] his use of a racial slur towards another inmate. Appellant admits defense counsel did not make contemporaneous objections to this evidence, thus waiving review on appeal for all but plain error. Appellant fails to show actual or obvious error with any of his claims.
¶52 The QuikTrip shooting evidence was properly admitted other crimes evidence under 12 O.S.2011, § 2404(B). This evidence was relevant to multiple issues in the case including to show the intent, motive, identity and plan underlying the charged crimes. The trial court instructed the jury with OUJI-CR (2d) 9-9 both orally during the trial, and in the written charge, concerning the limited use of this evidence. The State proved the existence of the other crimes evidence by clear and convincing evidence, going so far as to introduce surveillance video showing this drive-by shooting. Further, Bledsoe identified Appellant at trial as one of the gang members in the truck that opened fire while Bledsoe was pumping gas at the QuikTrip. The State too established a visible connection between both the QuikTrip shooting and the charged offense. The challenged evidence was relevant and its probative value was not outweighed by the danger of unfair prejudice, confusion of the issues or misdirection of the jury. 12 O.S.2011, §§ 2401-2403. The QuikTrip shooting evidence was critical to the jury's understanding of the course of events leading to the drive-by shooting resulting in Deouijanea Terry's murder. The evidence thus was necessary to support the State's burden of proof. There was no error, and thus no plain error, from the admission of this evidence for these limited purposes. See Moore v. State, 2019 OK CR 12, ¶ 15, 443 P.3d 579, 584 (discussing requirements for admission of other crimes or bad acts evidence). Relief is denied for this issue.
¶53 Appellant's challenge to the State's impeachment of him on cross-examination also does not show actual or obvious error. The record shows Appellant in his testimony opened the door to cross-examination about specific instances of past conduct that may not have resulted in a conviction. 12 O.S.2011, § 2608(B)(1); Dodd v. State, 2004 OK CR 31, ¶ 73, 100 P.3d 1017, 1039-40 ("A witness who offers one-sided versions of his own past conduct subjects himself to cross-examination aimed at showing the jury that he is not telling the whole truth about that conduct, and therefore, cannot be trusted to tell the truth about other matters either."). Here, the State appropriately questioned Appellant about his prior arrest for a gun crime after he repeatedly denied ever being caught with a gun.
¶54 Similarly, the State's cross-examination about Appellant having gang graffiti in his cell was relevant to refute his earlier testimony denying that he was a gang member. Evidence that Appellant instigated fights with other inmates in the county jail and called another inmate an inflammatory racial slur was relevant to impeach his testimony that he didn't want to get in trouble while incarcerated; that he was generally a non-violent person; and that he was not a member of a gang. The State's questions about Appellant having given a false name to authorities during the execution of a search warrant earlier in the summer of 2015 was relevant as a general matter to impeach Appellant's credibility. Appellant fails to show error, and thus there is no plain error, from these instances of impeachment with other crimes or bad acts. Id. Proposition VII is denied.
¶55 Proposition VIII. In his eighth proposition, Appellant challenges what he says was irrelevant and unfairly prejudicial evidence used by the State to connect him to illegal gang activity. This includes evidence of Appellant's association with other gang members and his documented presence at a gang house where ammunition was discovered. The vast majority of this challenged evidence did not draw contemporaneous objections on these grounds at trial. Regardless, Appellant fails to show error, and thus there is no plain error, from any of the challenged evidence.
¶56 This evidence was relevant to all three counts in the Information which included a charge of gang-related offense while in association with any criminal street gang or gang member. 21 O.S.2011, § 856.3. The State's theory was that Deouijanea Terry was an innocent bystander who lost her life in a drive-by gang shooting intended for her boyfriend, Jerome Bledsoe. The challenged evidence was relevant on multiple fronts to the State's burden of proof for all three counts including to prove motive, intent and plan for the charged crimes and to impeach Appellant's testimony. The probative value of this evidence was not outweighed by the danger of unfair prejudice, confusion of the issues or misdirection of the jury. Appellant was not deprived of a fundamentally fair trial in violation of due process from this evidence. 12 O.S.2011, §§ 2401-2403; Stewart v. State, 2016 OK CR 9, ¶ 19, 372 P.3d 508, 512. Proposition VIII is denied.
¶57 Proposition IX. Appellant next contends that trial counsel Brian Martin was constitutionally ineffective for "conceding guilt without permission" during closing arguments of the first stage of trial. After the close of evidence, defense counsel made the following closing argument spanning roughly two pages of the trial transcript:
MR. MARTIN: Thank you, Your Honor. Thank you for your time and attention today--or this week. It's awesome that you guys during voir dire didn't come up with some reason to try to get out of serving on this jury. Your job is important. Your service is welcomed by the Court, myself, the State.
Everything [the prosecutor] just told you is complete crap. That's what I'd like to say. If I'm being honest with you, that's not what--I can't say that. If you noticed by the amount of cross-examination I did during the course of this trial, I didn't have a lot of questions for the witnesses.
Punishment in this case is not before you at this point. Right now all you need to decide is whether or not you find him guilty or not guilty. Whether or not you believe there was a Quik Trip shooting, whether or not you believe there was a shooting at 46th and Martin Luther King. Whether or not you believe there were fingerprints in the van. And whether or not there were videos on Snapchat. Whether or not you believe there were .40 caliber shell casings in the van that were similar to the shell casings found at the murder scene.
[Appellant] will not be happy with my argument here, his family will not be happy with my argument here, but if I'm being honest and I'm being sincere, I have no legitimate argument with the evidence. I'm not going to tell you he's guilty, but I can't argue that the evidence is wrong.
I'd like to say what [the prosecutor] said was crap. I can't. I'm not going to be disingenuous with you. That's not how it goes.
When it comes to sentencing, that will be a different issue for a different time. But right now for this period of time, I appreciate what you've done, the fact that you've sat here, the fact that you've listened.
That's it. I thank you. You've done your job so far. You will go do your job here in a minute, and we'll get to talk again later. Thank you.
(Tr. 985-86).
¶58 Defense counsel's closing argument during the sentencing stage of trial included the following:
This is not a fun case. This was not an enjoyable case to try. And I think my closing argument during the first part of this trial let you know that. I know James' family is not [sic] upset with my trial strategy in this particular case, but I'm not going to be disingenuous to the jury and come in here and argue evidence that doesn't exist, things that don't make sense. This entire trial from the very beginning has been a sentencing trial. It wasn't a trial about guilt or innocence.
(2/22/2017 Tr. 59).
¶59 The Supreme Court has held that "counsel may not admit [his] client's guilt of a charged crime over the client's intransigent objection to that admission." McCoy v. Louisiana, __U.S.__, 138 S. Ct. 1500, 1510 (2018). The Court held that such a concession amounts to structural error violating the defendant's Sixth Amendment right to autonomy in deciding the objectives of his or her defense. Id., 138 S. Ct. at 1508-09, 1511 ("When a client expressly asserts that the objective of 'his defence' is to maintain innocence of the charged criminal acts, his lawyer must abide by that objective and may not override it by conceding guilt.") (quoting U.S. Const. amend. VI)) (emphasis in original).
¶60 In Jackson v. State, 2001 OK CR 37, 41 P.3d 395, defense counsel repeatedly told the jury during a capital murder trial that no one was going to contest the defendant's guilt. Id., 2001 OK CR 37, ¶¶ 11-14, 41 P.3d at 398. This strategy was employed by defense counsel as a means to secure a noncapital sentence during the penalty phase. Id., 2001 OK CR 37, ¶¶ 18-22, 41 P.3d at 399-400. We held that a concession of guilt "is a serious strategic decision that must only be made after consulting with the client and after receiving the client's consent or acquiescence." Id., 2001 OK CR 37, ¶ 25, 41 P.3d at 400. Because the record did not show that the defendant consented or acquiesced to this trial strategy, we reversed and remanded for a new trial. Id., 2001 OK CR 37, ¶¶ 22, 29, 41 P.3d at 399-401.
¶61 In light of this and other authority, and the record's silence concerning Appellant's consent to defense counsel's closing argument, we remanded Appellant's case for an evidentiary hearing before the District Court, pursuant to Rule 3.11(A), Rules of the Oklahoma Court of Criminal Appeals, Title 22, Ch.18, App. (2020), to address Appellant's claim that trial counsel conceded his guilt during closing without his permission.
[6] We ordered the District Court to address four issues:
1. Whether trial counsel conceded Appellant's guilt to the charges in counsel's statements to the jury during first stage closing argument;
2. If counsel conceded guilt, whether trial counsel consulted with Appellant about this strategy before first stage closing argument;
3. Whether trial counsel sought Appellant's consent to this strategy before first stage closing argument; and
4. Whether Appellant gave his consent to, or acquiesced in, defense counsel's concession strategy before first stage closing argument to the jury.
¶62 The evidentiary hearing was held on January 30, 2019, during which the trial court heard testimony from two witnesses: Brian Martin and Appellant. We have thoroughly reviewed both the transcript of that hearing along with Judge LaFortune's written findings of fact and conclusions of law filed with this Court on April 15, 2019, and the record from Appellant's jury trial. In addition, we have reviewed supplemental post-hearing briefs filed by both parties with this Court addressing the testimony and the district court's findings.
[7] 
¶63 Appellant fails to show that trial counsel was ineffective for conceding guilt during closing argument. The trial record shows Martin conducted voir dire, objected to the prosecutor's use of certain evidence, waived opening statements and cross-examined several of the State's witnesses, including Jerome Bledsoe. At the evidentiary hearing, Martin testified that Appellant agreed well before trial to a defense strategy of conceding guilt and asking for a sentence of life imprisonment with the possibility of parole--the lesser available punishment option in this case for the first degree malice murder charge. See 21 O.S.2011, § 701.9(A).[8] According to Martin, this trial strategy evolved after meeting with Appellant at the jail "on more than a dozen occasions." Martin proposed the concession strategy based on Appellant's age, the apparent strength of the State's evidence and Martin's desire to approach the jury "with a straight face" during the sentencing phase concerning the lesser of the two punishment options available for the murder. Martin obtained Appellant's consent to a concession of guilt at trial as part of a cohesive trial strategy designed to avoid a sentence of life without parole for the murder.

¶64 Martin testified the strategy changed when Appellant decided to take the stand after the State rested its case. The trial record shows that after the State rested its case in chief, Appellant informed the trial court during an ex parte hearing of his decision to testify in his own defense. Martin informed the trial court that Appellant's insistence to take the stand was against his advice. Defense counsel told Appellant on the record that taking the stand was "an absolutely horrible idea" and "would be . . . one of the worst decisions [Appellant has] ever made in his life."
[9] Trial counsel then informed the trial court of his belief that ethical constraints limited his participation in Appellant's direct examination.[10] 
¶65 In presenting Appellant's testimony in the defense case in chief, Martin asked opened-ended questions which allowed Appellant to testify in narrative form and give his version of events. This was out of ethical concerns, namely, to foreclose the possibility of defense counsel eliciting false testimony in his presentation of Appellant's direct examination. Defense counsel's reasons for doing this were fully explained to Appellant by Judge LaFortune during the ex parte hearing with Appellant and defense counsel immediately prior to Appellant taking the stand. Martin testified at the evidentiary hearing that Appellant's decision to testify was a "180-degree turn" from the original trial strategy. Martin decided at that point "to continue with the strategy that we started the trial with." Martin did not believe he could give a "straight-faced argument" to advance Appellant's narrative testimony that would not have offended the jury.

¶66 Martin denied that he implied to the jury during closing argument that they would be doing their job if they found Appellant guilty. Instead, Martin testified he said simply the jury was "going to go do their job." Martin denied too that he explicitly conceded Appellant's guilt during closing argument.
¶67 Appellant testified at the evidentiary hearing that he never gave defense counsel permission to concede guilt at the jury trial. Appellant also reiterated his innocence and testified he was surprised by defense counsel's closing argument. Appellant too claimed he never gave Martin permission to make the closing argument delivered to the jury and that he had wanted defense counsel to ask the jury to find him not guilty.
¶68 Judge LaFortune found defense counsel's closing argument "does not contain, at any point, any clear concession of guilt[,]" and that trial counsel "did not expressly or impliedly concede guilt in his first stage closing argument[.]" Judge LaFortune concluded too that Martin developed the concession strategy well before trial to maintain credibility with the jury so he could ask for the lesser of the two available punishments; that Appellant acquiesced to this strategy after several conversations with defense counsel as described in Martin's testimony; and that Appellant drastically changed this agreed strategy in the middle of the trial when he took the stand and proclaimed his innocence. Judge LaFortune found trial counsel "faced . . . both an ethical and strategic dilemma" when Appellant took the stand.
¶69 Despite Martin's testimony that he did not abandon the original strategy, Judge LaFortune concluded Martin "actually refrained from conceding guilt in his first stage closing argument to be as consistent as possible with the Appellant's drastic change in trial strategy, while maintaining some semblance of credibility." By so doing, Judge LaFortune concluded Martin "was able to walk the line of not losing all credibility with the jury, [while] still implicitly recognizing the Appellant's testimony by stating to the jury they had the job of determining whether the Appellant was guilty or not."
¶70 These findings are fully supported by the record. Defense counsel never expressly conceded guilt; never said that Appellant was the killer; and never said that Appellant committed the charged offenses. Nor did counsel ever tell the jury no one was contesting Appellant's guilt in the case or that the defense was not contesting the issues during the first stage of trial. Defense counsel also did not tell the jury that a finding of guilt was inevitable.
¶71 Instead, defense counsel acknowledged during his closing argument both the strength of the State's evidence and the corresponding limitations upon what he could say in response to this evidence. This was consistent with the defense strategy Appellant explicitly agreed to before trial but inexplicably abandoned when he decided to testify. Judge LaFortune correctly found that defense counsel faced "both an ethical and strategic dilemma" when Appellant "drastically altered the previously agreed upon trial strategy of conceding guilt" by taking the stand and proclaiming his innocence. Defense counsel did about as well as can be expected under these difficult circumstances to honor Appellant's decision to contradict the predetermined defense strategy with his testimony while maintaining some semblance of credibility before the jury.
¶72 Defense counsel acknowledged that he wanted to characterize the State's case as "complete crap" but said he was not going to be disingenuous in his closing argument by so doing. Defense counsel referenced different parts of the State's evidence and told the jury it was their job to determine whether or not they believed this evidence existed. This was reflective of Appellant's earlier testimony in which he proclaimed his innocence and attributed the State's case to exaggeration and outright fabrication by the police and prosecutor. Defense counsel's statement to the jury that "I have no legitimate argument with the evidence. I'm not going to tell you he's guilty, but I can't argue that the evidence is wrong" was merely an attempt to separate counsel from some of the more outrageous parts of Appellant's testimony. It did not, however, amount to a concession of guilt. Indeed, as Judge LaFortune adeptly observed in his written order, defense counsel himself denied in his evidentiary hearing testimony that he conceded Appellant's guilt. The record bears this out.
¶73 Defense counsel sought to maintain credibility with the jury for the upcoming sentencing phase without conceding Appellant's guilt. There is nothing improper about this approach. Our decisions hold that "a complete concession of guilt" by defense counsel during the guilt-innocence portion of trial "must only be made with the client's consent or acquiescence." Jackson, 2001 OK CR 37, ¶ 29, 41 P.3d at 400 (emphasis added). See also Johnson v. State, 2012 OK CR 5, ¶ 37, 272 P.3d 720, 732; Simpson v. State, 2010 OK CR 6, ¶ 50, 230 P.3d 888, 905; Lott v. State, 2004 OK CR 27, ¶¶ 51, 54, 98 P.3d 318, 337, 338; Lockett v. State, 2002 OK CR 30, ¶ 16, 53 P.3d 418, 424. In the present case, defense counsel did not overtly or impliedly concede Appellant's guilt, let alone make a complete concession of guilt to the jury.
¶74 The present case stands in stark contrast to McCoy v. Louisiana where the defendant "vociferously insisted that he did not engage in the charged acts and adamantly objected to any admission of guilt." McCoy, 138 S. Ct. at 1505. Yet, the trial judge in McCoy permitted defense counsel to tell the jury, during the guilt phase of a capital murder trial, that the defendant "committed three murders. . . .[H]e's guilty." Id. This was part of a calculated strategy by defense counsel to maintain credibility with the jury in order to save the defendant's life during the capital sentencing phase. Defense counsel repeatedly asserted the defendant's guilt throughout the trial and, at one point, admitted during closing arguments that he, defense counsel, had taken the burden off the prosecutor. The defendant expressed his disagreement with this strategy to the court and counsel at every opportunity. The defendant also "testified in his own defense, maintain[ed] his innocence and press[ed] an alibi difficult to fathom." Id. at 1506-07.
¶75 The lower court affirmed, finding that counsel had the authority to concede guilt in this manner, despite the defendant's stated opposition. Id. at 1507. The Supreme Court reversed, holding that "a defendant has the right to insist that counsel refrain from admitting guilt, even when counsel's experienced-based view is that confessing guilt offers the defendant the best chance to avoid the death penalty." Id. at 1505. The Court reasoned this was part of an accused's constitutionally-protected right to autonomy in deciding the objectives of the defense presented at trial. Id. at 1508.
¶76 In the present case, Appellant changed the trial strategy mid-trial when he decided to testify. The attorney is not responsible when a client abruptly changes his mind on strategy in the middle of a trial. McCoy does not apply in situations where the defendant agrees or acquiesces to a strategy of conceding guilt but changes his mind well into the trial--in this case, after the State's case in chief. McCoy set a firm rule in scenarios where defense counsel concedes guilt in derogation of the express wishes of a defendant made known to defense counsel from the outset.
¶77 McCoy is thus distinguishable from the present case in several ways. First, defense counsel in McCoy unequivocally and expressly conceded the defendant's guilt over his client's objection. Second, the record in McCoy shows that the defendant maintained his innocence from the beginning and throughout the trial, that his attorney knew this and both his attorney and the trial court knew the defendant did not agree with the strategy of conceding guilt. Id. at 1505-06. Third, the defendant in McCoy affirmatively sought to terminate his attorney's representation, but the trial court denied his request. Id. at 1506.
¶78 In the present case, the record shows defense counsel never expressly and unequivocally conceded Appellant's guilt as did counsel in McCoy. There is no comparison between Brian Martin's closing argument here and the attorney's statements in McCoy. Nothing in the record of the present case shows Appellant maintained his innocence and manifested his disagreement with the defense strategy from the beginning. Moreover, it was only at the evidentiary hearing that Appellant stated he never agreed with the defense concession strategy. Finally, Appellant never voiced, at any time prior to or during trial, any disagreement or concern regarding trial strategy or counsel's representation of him. Even during the ex parte hearing prior to his testimony, Appellant said nothing about disagreement with his attorney's strategy or his desire to change that strategy.
¶79 Based on the total circumstances, Appellant's ineffective assistance of counsel claim must be analyzed under the familiar Strickland two-pronged test. See Florida v. Nixon, 543 U.S. 175, 189-192 (2004). Cf. McCoy, 138 S. Ct. at 1510-11 (where a criminal defendant's "autonomy, not counsel's competence, is in issue, we do not apply our ineffective-assistance-of-counsel jurisprudence"). Unlike McCoy and Jackson, the present case does not involve a concession of guilt by counsel. The challenged argument represents the type of strategic decision making which is well within counsel's authority to make. "Trial management is the lawyer's province: Counsel provides his or her assistance by making decisions such as 'what arguments to pursue, what evidentiary objections to raise, and what agreements to conclude regarding the admission of evidence.'" McCoy, 138 S. Ct. at 1508 (quoting Gonzalez v. United States, 553 U.S. 242, 248 (2008)). Defense counsel's closing argument here did not "block[ ] the defendant's right to make the fundamental choices about his own defense." McCoy, 138 S. Ct. at 1511. Rather, the defense closing argument was a reasonable strategic decision "about how best to achieve [Appellant's] objectives[.]" Id., 138 S. Ct. at 1508 (emphasis in original). As there was no concession of guilt, defense counsel was not required to obtain Appellant's permission before proceeding with the challenged argument. Appellant fails to show either deficient performance or prejudice with this claim as required under the Strickland two-pronged test. Proposition IX is denied.
¶80 Proposition X. Appellant alleges the rule in Bruton v. United States, 391 U.S. 123 (1968) was violated in his case. Bruton held that a defendant's Sixth Amendment right to confront witnesses is violated by the government's use at trial of a non-testifying co-defendant's out-of-court statements inculpating the defendant in the charged offense. Id. at 126. Appellant challenges with the Bruton rule two categories of evidence admitted at trial. First, he challenges Roshawn Banks's testimony that Appellant's codefendants admitted their participation in the July 17, 2015, drive-by shooting that resulted in Deouijanea Terry's murder. The record shows these statements were made in Banks's house, in Appellant's presence, after the drive-by shooting and murder.
¶81 Appellant did not object to this testimony on these grounds at trial. See Melendez-Diaz v. Massachusetts, 557 U.S. 305, 327 (2009) ("The defendant always has the burden of raising his Confrontation Clause objection[.]") (emphasis in original)). Our review is therefore limited to plain error. Tryon, 2018 OK CR 20, ¶ 38, 423 P.3d at 632. Appellant fails to show actual or obvious error. In Crawford v. Washington, 541 U.S. 36 (2004), the Supreme Court drew a distinction between testimonial and nontestimonial hearsay statements, finding the Sixth Amendment's Confrontation Clause is limited to testimonial out-of-court statements like police interrogations and prior testimony. Id. at 53, 68. Further, "[w]here testimonial evidence is at issue . . . the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination." Id. at 68.
¶82 The challenged statements of Appellant's codefendants repeated in Banks's testimony were nontestimonial. These statements were not made at a hearing or trial, nor as a result of police interrogation. Tryon, 2018 OK CR 20, ¶ 42, 423 P.3d at 633. Nor is there any evidence these statements were made so they could be used later as an out-of-court substitute for trial testimony. See Ohio v. Clark, 576 U.S. 237, 244-45 (2015); Tryon, 2018 OK CR 20, ¶ 42, 423 P.3d at 633. Rather, they were informal statements, made amongst gangland acquaintances at a private residence, about a drive-by shooting they had perpetrated earlier. See Crawford, 541 U.S. at 51 ("An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not."). The Confrontation Clause has no application to out-of-court nontestimonial statements like those present here. See Michigan v. Bryant, 562 U.S. 344, 354 (2011); Whorton v. Bockting, 549 U.S. 406, 420 (2007); Davis v. Washington, 547 U.S. 813, 821 (2006); Tryon, 2018 OK CR 20, ¶ 41, 423 P.3d at 633.
¶83 This is true even for nontestimonial statements seemingly implicated by the Bruton rule. The Tenth Circuit has held Bruton should be interpreted "consistent[ly] with the present state of Sixth Amendment law." United States v. Clark, 717 F.3d 790, 815 (10th Cir. 2013) (internal quotation omitted).
[11] The Tenth Circuit explained that "Crawford made clear that the Confrontation Clause applies only if a statement is 'testimonial' in nature, for '[o]nly statements of this sort cause the declarant to be a 'witness' within the meaning of the Confrontation Clause.'" Id. (quoting Davis, 547 U.S. at 821). Further, "Crawford indicates that the class of testimonial statements that fall within the protective ambit of the Confrontation Clause includes, but is not limited to, statements covered also by Bruton." Id. (citing Crawford, 541 U.S. at 51-52) (emphasis in original). We find Clark persuasive and adopt its reasoning to conclude there is no error, and thus no plain error, from the admission of Banks's challenged testimony.[12] The challenged testimony here relayed nontestimonial statements and, therefore, was outside the protective ambit of the Confrontation Clause. Relief for this portion of Appellant's Confrontation Clause challenge is denied.
¶84 Appellant also challenges the admission of co-defendant Joshua Price's out-of-court statement, relayed in Det. White's testimony, that he, Price, stole during the early morning hours of July 17, 2015, the van used in the drive-by shooting and murder. Appellant objected to the admission of this statement on different grounds than now raised. Again, our review is limited to plain error. See Tryon, 2018 OK CR 20, ¶ 38, 423 P.3d at 632; Al-Mosawi v. State, 1996 OK CR 59, ¶ 22, 929 P.2d 270, 278. This particular confession was made by Price to authorities upon his arrest and in response to custodial interrogation. It was therefore testimonial and subject to the requirements of the Confrontation Clause. Crawford, 541 U.S. at 52 ("Statements taken by police officers in the course of interrogations are also testimonial under even a narrow standard.").
¶85 Price's admission about stealing the van is not the type of statement typically prohibited by Bruton. This statement does not directly implicate Appellant in the July 17, 2015, drive-by shooting resulting in Ms. Terry's murder. Rather, it becomes incriminating only when combined with other evidence implicating Appellant in these crimes. These types of statements, which inculpate only inferentially, are not typically implicated by Bruton's rule. Gray v. Maryland, 523 U.S. 185, 195 (1998); Richardson v. Marsh, 481 U.S. 200, 208 (1987). See Fowler v. State, 1989 OK CR 52, ¶¶ 34-35, 779 P.2d 580, 586.
¶86 The real question here is whether the introduction of Price's statement violates the Sixth Amendment in light of Crawford because of its testimonial nature, even though it did not directly or explicitly inculpate Appellant. Applying Crawford, we find that Price's statement to Det. White was testimonial and, thus, inadmissible barring a showing both that Price was unavailable and that Appellant had a prior opportunity to cross-examine Price. Although the record shows Price was unavailable,
[13] there was no prior opportunity for cross-examination. Appellant thus shows actual or obvious error affecting his substantial rights with this particular testimony. Nonetheless, relief is unwarranted because the error was harmless beyond a reasonable doubt. See Chapman v. California, 386 U.S. 18, 24 (1967); Tafolla, 2019 OK CR 15, ¶ 22, 446 P.3d at 1259. Det. White's testimony on this point was offered mainly to show the police investigation in this case and was eclipsed by the eyewitness testimony from Bledsoe identifying Appellant as one of the perpetrators involved in the drive-by shootings; the identification of this van by a bystander in traffic as the one used in the drive-by shooting; the fingerprints linking Appellant to the stolen van used in the murder; and Banks's testimony that Appellant and his accomplices bragged about the shootings. Because the violation of Appellant's Sixth Amendment right to confrontation was harmless beyond a reasonable doubt, Proposition X is denied.
¶87 Proposition XI. Appellant contends 1) the "Gang-Related Offense" alleged in Count 3 "is an unconstitutionally vague charge" that violates due process; 2) Instruction No. 42 defining this crime deviated from the uniform instruction and was "a nightmare"; and 3) the introduction of unduly prejudicial exhibits to prove this crime resulted in inflated sentences on the other counts. Appellant argues that both the offense and the instruction "are so vague that one could not read the statute and contemplate that the activity they charged [Appellant] with was the activity prohibited by that statute."
¶88 This proposition is waived from appellate review. First, Appellant has combined multiple issues--a constitutional vagueness challenge to 21 O.S.2011, § 856.3, an instructional error and an evidentiary challenge--into a single proposition of error. This violates Rule 3.5(A)(5), Rules of the Oklahoma Court of Criminal Appeals, Title 22, Ch.18, App. (2020) ("Each proposition of error shall be set out separately in the brief. . . . Failure to list an issue pursuant to these requirements constitutes waiver of alleged error."). Appellant has presented related, but clearly separate and distinct issues. All of these issues are thus waived. See Baird v. State, 2017 OK CR 16, ¶ 28, 400 P.3d 875, 883.
¶89 Second, each and every one of these claims is so inadequately developed in Appellant's brief in chief as to be waived from our review, even if they were presented in separate propositions of error. Appellant offers little more than conclusory statements for each claim with little in the way of actual argument and authority in support. See Rule 3.5(A)(5), supra (requiring argument in support of a proposition of error supported by citation of authorities, statutes and parts of the record). See Davis v. State, 2018 OK CR 7, ¶ 32, 419 P.3d 271, 282. Appellant has thus waived review on appeal of these three separate and discrete claims. Proposition XI is denied.
¶90 Proposition XII. Appellant contends his convictions for first degree murder and gang-related offense violate the state and federal constitutional prohibitions against double jeopardy. See U.S. Const., amends. V, XIV; Okla. Const. art. 2, § 21; Kane v. State, 1996 OK CR 14, ¶ 6 n.5, 915 P.2d 932, 934 n.5. Appellant's argument simply is this: "The Murder instructions (O.R. 436) do not require proof of an element not required by the 'Gang Related [offense].' (O.R. 448). Blockburger v. United States, 284 U.S. 299 (1932)." Appellant did not raise this claim below, thus waiving review of all but plain error. Barnard, 2012 OK CR 15, ¶ 25, 290 P.3d at 767.
¶91 Appellant fails to show actual or obvious error. The Supreme Court has held:
The Double Jeopardy Clause "protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense." North Carolina v. Pearce, 395 U.S. 711, 717 (1969) (footnotes omitted). 
Brown v. Ohio, 432 U.S. 161, 165 (1977). Only the third aspect of the Double Jeopardy clause, protecting against cumulative punishments for the same offense imposed in a single proceeding, is at issue here. See Jones v. Thomas, 491 U.S. 376, 381 (1989). In this regard, the Supreme Court has held:
Where consecutive sentences are imposed at a single criminal trial, the role of the constitutional guarantee is limited to assuring that the court does not exceed its legislative authorization by imposing multiple punishments for the same offense. 
Brown, 432 U.S. at 165 (internal citations omitted).
¶92 The elements of the Count 3 gang-related offense alleged here include all the elements of first degree murder.
[14] The Legislature, however, has explicitly authorized cumulative punishment for the same act under these circumstances. Title 21 O.S.2011, § 856.3 states:
Any person who attempts or commits a gang-related offense . . . while in association with any criminal street gang or gang member shall be guilty of a felony offense. Upon conviction, the violator shall be punished by incarceration in the custody of the Department of Corrections for a term of five (5) years, which shall be in addition to any other penalty imposed. For purposes of this section, "criminal street gang" is defined in subsection F of Section 856 of Title 21 of the Oklahoma Statutes and "gang-related offense" means those offenses enumerated in paragraphs 1 through 16 of subsection F of Section 856 of Title 21 of the Oklahoma Statutes.
(emphasis added). Title 21 O.S.2011, § 856(F)(5) includes the crime of first degree murder as a "gang-related offense."
¶93 Typically we apply the Blockburger test to determine "whether each provision requires proof of a fact which the other does not." Blockburger, 284 U.S. at 304. Appellant ignores, however, the Blockburger test is a rule of statutory construction that does not apply "[w]here, as here, a legislature specifically authorizes cumulative punishment under two statutes, regardless of whether those two statutes proscribe the 'same' conduct under Blockburger[.]" Missouri v. Hunter, 459 U.S. 359, 368 (1983).
¶94 "Legislatures, not courts, prescribe the scope of punishments." Id. Here, the Legislature's intent authorizing multiple punishments for the gang murder committed by Appellant could not be more clear. Section 856.3 specifically provides the mandatory five-year penalty imposed for acting in association with any criminal street gang or gang member while committing a gang-related offense "shall be in addition to any other penalty imposed"--in this case, first degree murder. There is no violation of either the state or constitutional Double Jeopardy provisions from Appellant's convictions for gang-related offense and first degree murder. There is no error and thus no plain error. Proposition XII is denied.
¶95 Proposition XIII. Appellant complains his convictions for gang-related offense and first degree murder are barred under Oklahoma's statutory prohibition against double punishment for the same act, contained in 21 O.S.Supp.2011, § 11(A) ("[I]n no case can a criminal act or omission be punished under more than one section of law[.]"). This claim too was not raised below and our review is again limited to plain error. Lavorcheck v. State, 2019 OK CR 13, ¶ 5, 443 P.3d 573, 576-77. Appellant fails to show actual or obvious error. "Double-punishment analysis focuses on the relationship between the crimes. If the offenses truly arise out of one act, [Section 11] prohibits prosecution for more than one crime, absent express legislative intent." Lavorchek, 2019 OK CR 13, ¶ 6, 443 P.3d at 577 (emphasis added). As discussed earlier in Proposition XII, the Legislature has expressly authorized multiple punishments for the gang-related murder in this case under both the first degree murder and gang-related crime statutes. There is no error, and thus no plain error, from Appellant's convictions for both crimes. Proposition XIII is denied.
¶96 Proposition XIV. Appellant claims the State improperly published to the jury that portion of his videotaped custodial interview showing his invocation of the right to counsel and his subsequent refusal when asked by the detectives to give a DNA sample. Defense counsel requested during an in camera hearing that Appellant's interview be stopped before his invocation of rights. The trial court instead ordered the video be stopped after Appellant's invocation of counsel, thus omitting Appellant's refusal to give a DNA sample.
¶97 At the conclusion of the State's publication of Appellant's interview, defense counsel objected on grounds that the prosecutor failed to stop the video in time and had unintentionally played for the jury the disallowed portion of the video. The trial court apparently did not hear this occur and asked whether the prosecutor heard that portion of the video being played. The prosecutor responded he "was getting to it" and "[a]s soon as [Appellant] invoked, I was reaching and trying to hit it." The prosecutor told the trial court "I don't even think [Appellant] answered the question." Defense counsel claimed the prosecutor "let it play through" to where the detective said "so you're not going to give us your DNA [sample]." Review of the video shows this would have occurred after Appellant told the detectives to talk to his counsel. Defense counsel emphasized he did not believe the prosecutor did anything intentionally wrong but nonetheless the failure to stop the tape as previously ordered was negligent. Defense counsel objected and the trial court overruled same.
¶98 The record shows Appellant was given the Miranda
[15] warning at the beginning of the interview and he waived those rights when he agreed to speak with the detectives. The record, however, does not establish precisely what the jury heard because the parties waived the reporting of the publication of the interview. Assuming arguendo the jury heard Appellant invoke his right to counsel and heard the detective's statement that Appellant was not going to give a DNA sample, any violation of Appellant's Fifth Amendment rights was harmless beyond a reasonable doubt. See Stemple v. State, 2000 OK CR 4, ¶¶ 38-41, 994 P.2d 61, 70. The challenged portion came at the end of a short interview during which Appellant was generally nonresponsive to the questioning, obstinate towards the detectives and completely uncooperative. The jury would hardly be surprised Appellant ended the interview by telling the detectives to talk to his lawyer then refused to provide a DNA sample given his overall lack of cooperation as shown throughout the video. Appellant's trial testimony proclaiming his innocence, and accusing the State of fabricating its case against him, eclipsed the statements he made during this brief interview. Here, the State presented a strong case against Appellant including eyewitness testimony pinning him as one of the shooters, testimony showing Appellant bragged about the shooting afterwards with his accomplices and fingerprint evidence connecting Appellant to the van used in the drive-by shooting. Under the total circumstances, any error was harmless beyond a reasonable doubt. Proposition XIV is denied.
¶99 Proposition XV. Appellant complains that his sentencing stage was not conducted in accordance with Luna v. State, 2016 OK CR 27, 387 P.3d 956 because trial counsel presented an inadequate case in mitigation and his accumulated sentences amount to a life without parole sentence. Appellant thus requests his case be remanded for a new sentencing hearing.
¶100 Appellant did not raise this claim below, limiting our review to plain error. Appellant fails to show actual or obvious error. In accordance with Luna, the trial court bifurcated Appellant's trial and allowed defense counsel to present evidence of mitigating circumstances suggesting Appellant's crimes reflected his transient immaturity (as opposed to irreparable corruption and permanent incorrigibility) in an effort to convince the jury he should not be sentenced to life without parole. Luna, 2016 OK CR 27, ¶ 21, 387 P.3d at 963. Defense counsel presented mitigating evidence from Appellant's mother who testified concerning Appellant's background, character and development. The jury was also given the written sentencing instruction mandated by this Court in Luna to guide the jury's consideration of the sentencing-phase evidence. Id., 2016 OK CR 27, ¶ 21 n.11, 387 P.3d at 963 n.11.
¶101 Trial counsel's efforts in this regard were successful: Appellant was sentenced to life imprisonment with the possibility of parole for the murder. Further, the aggregate of the sentences on Counts 1--3 in this case for the crimes Appellant committed does not violate the Eighth Amendment. The Eighth Amendment analysis in this context "focuses on the sentence imposed for each specific crime, not on the cumulative sentence for multiple crimes." Detwiler v. State, 2019 OK CR 20, ¶ 6, 449 P.3d 873, 875. The Supreme Court has held that a juvenile may not be sentenced to life without parole for non-homicide crimes. Graham v. Florida, 560 U.S. 48, 82 (2010); Detwiler, 2019 OK CR 20, ¶ 7, 449 P.3d at 875. As discussed above, Appellant was not sentenced to life without parole for any of his crimes. Thus, the Eighth Amendment was not violated by any of Appellant's sentences.
¶102 Appellant's real complaint is his dissatisfaction with the mitigation evidence presented by trial counsel. Appellant does not allege, however, that trial counsel was ineffective during the sentencing phase based upon his failure to present better or different mitigation evidence. Moreover, he does not show us what specific evidence trial counsel should have presented. Instead, Appellant talks in generalities. Under the total circumstances, Appellant fails to show error, and thus there is no plain error, based upon his challenge to the conduct of his sentencing proceeding. Proposition XV is denied.
¶103 Proposition XVI. In his final proposition of error, Appellant contends that the cumulative effect of the individual errors he identified on appeal warrants relief because they deprived him of a fair trial. We deny relief for Appellant's cumulative error claim. We rejected Appellant's individual claims of error outright after conducting harmless error review for the constitutional errors found in Propositions X and XIV. Review of the total record shows this is simply not a case where numerous irregularities during Appellant's trial tended to prejudice his rights or otherwise deny him a fair trial. Tryon, 2018 OK CR 20, ¶ 144, 423 P.3d at 655. Proposition XVI is denied.
DECISION
¶104 The Judgments and Sentences of the District Court are AFFIRMED. Appellant's Application for Evidentiary Hearing on Sixth Amendment Claim and Brief in Support is DENIED. Pursuant to Rule 3.15, Rules of the Oklahoma Court of Criminal Appeals, Title 22, Ch.18, App. (2020), the MANDATE is ORDERED issued upon the delivery and filing of this decision.
AN APPEAL FROM THE DISTRICT COURT OF TULSA COUNTY
THE HONORABLE WILLIAM D. LAFORTUNE, DISTRICT JUDGE




APPEARANCES AT TRIAL
BRIAN MARTIN
ATTORNEY AT LAW
1331 S. DENVER AVE.
TULSA, OK 74119
COUNSEL FOR DEFENDANT
ISAAC SHIELDS
MARK MORGAN
ASST. DISTRICT ATTORNEYS
TULSA COUNTY
500 S. DENVER AVE., SUITE 900
TULSA, OK 74103
COUNSEL FOR THE STATE

APPEARANCES ON APPEAL
BOBBY LEWIS
OKLA. INDIGENT DEFENSE SYSTEM
P.O. BOX 926
NORMAN, OK 73070
COUNSEL FOR APPELLANT
MIKE HUNTER
ATTORNEY GENERAL OF OKLAHOMA
JENNIFER B. MILLER
MATTHEW D. HAIRE
ASST. ATTYS. GENERAL
313 N.E. 21ST STREET
OKLAHOMA CITY, OK 73105
COUNSEL FOR APPELLEE
RANDALL YOUNG
RAY PENNY
ASST. DISTRICT ATTORNEYS
TULSA COUNTY
500 S. DENVER AVE.
SUITE 900
TULSA, OK 74103
COUNSEL FOR APPELLEE AT RULE 3.11 HEARING



OPINION BY: HUDSON, J.
LEWIS, P.J.: DISSENT KUEHN, V.P.J.: DISSENT
LUMPKIN, J.: CONCUR ROWLAND, J.: CONCUR 
FOOTNOTES
[1] Appellant must serve 85% of the sentences imposed on Counts 1 and 2 before becoming eligible for parole. 21 O.S.Supp.2015, § 13.1(1), (5).
[2] The van's front passenger side window was also open.
[3] The record shows Banks was arrested by Tulsa Police on January 25, 2017, on unrelated charges and was released on bond the same day. The prosecutor mentioned during his offer of proof (discussed infra) that his decision to seek revocation of Banks's personal recognizance bond occurred when the State discovered Banks had been arrested outside Tulsa County for another crime. Orndorff testified he was aware of Banks being arrested on at least two and possibly three occasions for committing crimes in Oklahoma.
[4] Defense counsel posed similar questions during his cross-examination of Det. White, at one point referencing the hour and minute shown on the video counter during the interview to identify a particular exchange.
[5] Appellant does not allege the State withheld evidence from defense counsel. Appellant acknowledges defense counsel was supplied Bledsoe's videotaped interview in discovery. Had the State withheld this information, Appellant could have raised the issue in a timely motion for new trial. 22 O.S.2011, §§ 952-953; Rule 2.1(A), Rules of the Oklahoma Court of Criminal Appeals, Title 22, Ch.18, App. (2020); Reed v. State, 1983 OK CR 12, ¶¶ 6-10, 657 P.2d 662, 664.
[6] See Order Remanding for Evidentiary Hearing, No. F-2017-223 (Okl.Cr. Dec. 14, 2018) (unpublished).
[7] Appellant filed his post-hearing supplemental brief with this Court on April 26, 2019. The State filed its supplemental brief on June 11, 2019.
[8] Appellant faced a sentence on Count 1 of either life or life without parole. Because of his age at the time of the murder, Appellant was ineligible for the death penalty. Roper v. Simmons, 543 U.S. 551, 578 (2005); Thompson v. Oklahoma, 487 U.S. 815, 838 (1988) (plurality opinion).
[9] Martin cited Appellant's lack of understanding of the law and his volatility when asked difficult questions by counsel.
[10] See Rule 3.3(a)(3)--Candor Toward the Tribunal, Oklahoma Rules of Professional Conduct, 5 O.S.2011, Ch.1, App. 3-A (generally prohibiting a lawyer from offering "evidence that the lawyer knows to be false"); and Comment, ¶ 7 (noting some jurisdictions "have required counsel to present the accused as a witness or to give a narrative statement if the accused so desires, even if counsel knows that the testimony or statement will be false"). See Nix v. Whiteside, 475 U.S. 157, 174-76 (1986) (holding the right to counsel includes no right to the assistance of counsel in a plan to commit perjury; counsel's admonition to a client not to give false testimony was not ineffective assistance of counsel under Strickland).
[11] The vast majority of federal circuit courts have reached the same conclusion. Accord United States v. Vasquez, 766 F.3d 373, 378-79 (5th Cir. 2014); United States v. Dargan, 738 F.3d 643, 651 (4th Cir. 2013); United States v. Berrios, 676 F.3d 118, 128 (3d Cir. 2012); United States v. Figueroa-Cartagena, 612 F.3d 69, 85 (1st Cir. 2010); United States v. Johnson, 581 F.3d 320, 326 (6th Cir 2009); United States v. Spotted Elk, 548 F.3d 641, 662 (8th Cir. 2008).
[12] We recently took the same approach in Clark v. State, No. F-2017-1306, slip op. at 15-26 (Okl.Cr. Oct. 24, 2019) (unpublished).
[13] During a bench conference, the parties and trial court noted Price had refused the State's previous offer to testify in exchange for immunity. See 12 O.S.Supp.2014, § 2804(A)(1); Thompson, 2007 OK CR 38, ¶ 18, 169 P.3d at 1204 ("[U]navailability also includes the situation where a witness has a valid Fifth Amendment privilege not to testify[.]").
[14] The elements of gang-related offense as alleged in this case are 1) willfully; 2) attempts or commits; 3) murder and/or assault and battery with a deadly weapon; 4) while in association with any criminal street gang or gang member.
[15] See Miranda v. Arizona, 384 U.S. 436 (1966).




LEWIS, PRESIDING JUDGE, DISSENTING:
¶1 I respectfully dissent. Defense counsel conceded guilt without the Appellant's consent in violation of his right to the assistance of counsel for his defense. The unauthorized concession of guilt, even if tactically sound, was a structural error requiring reversal of the convictions under McCoy v. Louisiana, 138 S.Ct. 1500 (2018). I also conclude that Appellant's consecutive sentences of life plus sixty (60) years imprisonment deny him any meaningful opportunity for release on parole, without the findings of permanent incorrigibility or irreparable corruption required by Miller v. Alabama, 567 U.S. 460 (2012) and Montgomery v. Louisiana, 577 U.S. 460 (2016). See Martinez v. State, 2019 OK CR 7, ¶¶ 1-5, 442 P.3d 154, 157-58 (Lewis, P.J., joined by Kuehn, V.P.J., dissenting). I would reverse and remand this case for a new trial.
¶2 After hearing testimony at the remanded evidentiary hearing, Judge LaFortune found that: (1) Trial counsel developed a strategy in the months before trial "to concede guilt to be able to approach the jury with a straight face" in the punishment phase of trial; (2) Trial counsel had consulted with Appellant several times about this strategy, and Appellant had initially agreed to, or acquiesced in, that trial strategy; (3) Appellant had "drastically altered" that strategy at the close of the prosecution's case with his decision to take the stand and proclaim his innocence; (4) Trial counsel nevertheless decided "to not abandon" the concession strategy in closing argument; (5) Trial counsel had (a) "actually refrained from conceding guilt . . . to be as consistent as possible with the Appellant's drastic change in trial strategy;" and (b) managed to "walk the line of not losing all credibility" while "implicitly recognizing the Appellant's testimony" when he (c) told jurors "they had the job of determining whether Appellant was guilty or not."
¶3 Most of these findings are well supported. But Judge LaFortune's finding and conclusion that defense counsel avoided "a clear concession of guilt, or even an implied one" is clearly erroneous, and involves an unreasonable application of clearly established Sixth Amendment law to the facts of this case. The Court today unfortunately adopts the trial court's clearly erroneous finding and its unreasonable application of federal law in reaching its decision.
¶4 The Court acknowledges, as the trial court did on remand, that defense counsel crafted a strategy to concede Appellant's guilt long before the start of Appellant's trial. Appellant initially agreed to that strategy. Just as clearly, Appellant later changed his mind about the ultimate objectives for his defense when he decided to testify and maintain his innocence of all charges to the jury. Judge LaFortune was therefore undoubtedly correct in concluding that after Appellant made the decision to maintain his innocence, a concession of guilt "was no longer the Appellant's chosen trial strategy."[1]
¶5 The critical question then is whether defense counsel conceded guilt in closing argument. The Court's resolution of this question, not unlike the trial court's on remand, comes off strained and unconvincing. In the final analysis, both courts are simply unwilling to say what was probably obvious to the jury: Despite the defendant's assertions of innocence, counsel was acknowledging guilt to morally (and tactically) distance himself from the defendant. The Court's conclusion that counsel refrained from conceding guilt is not fundamentally reasonable.
¶6 Black's Law Dictionary 262 (5th Ed. 1979) briefly defines a concession as "a yielding to a claim or demand." Webster's Ninth New Collegiate Dictionary 271 (1986) says to "concede" is to "accept as true, valid, or accurate." The unabridged Webster's Third New International Dictionary 469 (1963) says to "concede" is to "acknowledge grudgingly or hesitantly;" or to "acknowledge as won by an opponent without formal determination of the result."
¶7 Counsel's first-stage closing argument must be viewed in context. The prosecutor, after all, had just given a closing argument too, directly asserting Appellant's guilt of all charges beyond a reasonable doubt. Right before defense counsel's argument, the jury heard the prosecutor say this:
So ladies and gentlemen, you know that it's [Appellant]. The evidence at the scene, the evidence through that van, and the testimony in this case, it all points to him. [T]here is absolutely no question that the State of Oklahoma has proven its case beyond a reasonable doubt . . . He's a gangster, he's a shooter, and he's a murderer. And you need to find him guilty (emphasis added in all quotations). 
¶8 In response to this, defense counsel launched his closing argument with, "Everything Mr. Morgan just told you is complete crap." He then just as dramatically reversed course with, "That's what I'd like to say. If I'm being honest with you, that's not what--I can't say that."
¶9 The remainder of counsel's speech built upon and amplified that striking rhetorical inversion. Counsel recalled for jurors the very limited defense he presented to the State's case: "If you noticed by the amount of cross examination I did during the course of this trial, I didn't have a lot of questions for the witnesses." Counsel moved on quickly to the issues that really concerned him. "Punishment in this case is not before you at this point. Right now all you need to decide is whether or not you find him guilty or not guilty."
¶10 He recalled the major points of the prosecution's case against the Appellant; the same points the prosecutor had just repeatedly mentioned.
Whether or not you believe there was a Quik Trip shooting, whether or not you believe there was a shooting at 46th and Martin Luther King. Whether or not you believe there were [Appellant's] fingerprints in the van. And whether or not there were videos [of Appellant] on Snapchat. Whether or not you believe there were .40 caliber shell casings in the van that were similar to the shell casings found at the murder scene.
¶11 And in the heart of the argument, counsel powerfully dissociated himself from Appellant's testimonial claim of innocence:
James will not be happy with my argument here, his family will not be happy with my argument here, but if I'm being honest and I'm being sincere, I have no legitimate argument with the evidence. I'm not going to tell you he's guilty, but I can't argue that the evidence is wrong.
¶12 Counsel then returned to his initial statement, and strongly reiterated his position: "I'd like to say what Mr. Morgan said was crap. I can't. I'm not going to be disingenuous with you. That's not how it goes." 
¶13 This Court today declares that the sum of these statements do not amount to a concession, which really makes me wonder which part of Appellant's guilt counsel managed not to concede in this brief argument. The argument's basic rhetorical structure, its expressed tactical purpose, and most importantly, its probable impact on the jury, compel me to conclude that counsel fully conceded Appellant's guilt. Counsel's remarks yielded entirely to the State's claim that Appellant was guilty. He repeatedly accepted the prosecution's evidence of guilt as true, valid, and accurate. Though sometimes affecting to do so grudgingly or hesitantly, he acknowledged that the proof of Appellant's guilt was wholly inarguable. As a matter of fact and law, counsel's closing argument objectively crossed the line and conceded guilt.
¶14 The trial court's finding that no "clear concession of guilt" occurred placed considerable weight on counsel's curiously crafted statement: "I'm not going to tell you he's guilty, but I can't argue that the evidence is wrong." I also find this statement particularly significant in reaching the opposite conclusion. Considering the fair import of this statement to jurors, and the specific context where it appears, the statement is best understood as an apophasic disclaimer that preceded a stylized, yet unequivocal, concession of guilt.
¶15 Apophasic statements typically "deny[] one's intention to speak of a subject that is at the same time mentioned or insinuated." Webster's Unabridged Dictionary of the English Language, RHR Press (2001). As famously epitomized in Marc Antony's funeral speech in Shakespeare's Julius Caesar,
[2] and the ancient Roman defense speeches of Marcus Tullius Cicero,[3] apophasis allows the speaker to intimate their real position on a topic while maintaining some plausible deniability of having actually taken that position.[4]
¶16 Judge LaFortune characterized counsel's "I'm not going to tell you" statement as an instance of equivocation by which counsel managed to "walk the line" and avoid any "clear concession." On the contrary, despite its apophasic preamble ("I'm not going to tell you he's guilty"), the jury almost certainly understood counsel's next statement ("but I can't argue that the evidence is wrong") as a clear concession of guilt. Conscious of the tension between the strategy he had chosen and Appellant's actual defense, defense counsel apophasically denied conceding the very thing he was about to concede.
¶17 Having made this concession, counsel told the jury that "[w]hen it comes to sentencing, that will be a different issue for a different time." There will be a real contest, real argument, a real dispute over the sentences.
But right now for this period of time
, I appreciate what you've done, the fact that you've sat here, the fact that you've listened. That's it. I thank you. You've done your job so far. You will go do your job here in a minute, and we'll get to talk again later. Thank you.
¶18 The fair import of counsel's closing argument was not lost on the prosecutor, who, without objection, reiterated counsel's concession of guilt in the State's final first-stage closing:
[W]hat Mr. Martin is saying . . . is that you can have the world's greatest attorney, but the purpose behind this criminal justice system is to find the truth, and that has been elicited this week. He [Appellant] did it."
¶19 Again, we know exactly why defense counsel's closing argument proceeded in this way. Counsel testified at the evidentiary hearing that he was primarily seeking to maintain credibility for his arguments in the sentencing stage. He pursued this goal by displaying his professional ethos: acknowledging the evidence of guilt was incontestable; distancing himself from Appellant's far-fetched claims of innocence.
¶20 In the face of all this, I am not persuaded by the theory that counsel's salting of his concession with a few references to the jury's coming "job" to deliberate Appellant's guilt, or to the lines of evidence it would consider, somehow "implicitly" acknowledged Appellant's claim of innocence, or avoided a full concession of guilt. When counsel conceded that there was "no legitimate argument" with the State's evidence, and that he couldn't say the State's evidence was "wrong," he unmistakably implied that Appellant's testimony of innocence could assume no importance in the jury's coming deliberations.
¶21 By the Court's reasoning, a lawyer could most always technically avoid a legal concession of guilt simply by acknowledging that jurors would soon leave the courtroom and decide the matter for themselves. This is absurd. Every lawyer who addresses a jury implicitly acknowledges the ultimate decision is theirs. To say so in closing argument is only stating the obvious. A defense lawyer's concession of guilt does not end the criminal trial; it does not produce a guilty verdict ipso facto. But viewed as a whole, counsel's closing argument sought credibility with jurors by repeatedly acknowledging the inevitable result of their deliberations on the evidence: the conclusion of Appellant's guilt.
¶22 Appellant's decision to change the objectives of his defense after the State rested, though perhaps irksome to trial counsel and plainly repugnant to the Court, was a timely and valid exercise of constitutionally protected autonomy clearly established by the Supreme Court in McCoy, 138 S.Ct. at 1511-12, and earlier cases. See also, Brooks v. Tennessee, 406 U.S. 605, 613 (1972) (holding that due process protects defendant's freedom to remain silent, or elect to testify, at any time in the course of presenting his trial defense).
¶23 Appellant's decision effectively revoked the prior agreement to the original concession strategy, and constitutionally precluded counsel from making an otherwise tactically reasonable concession of guilt. Counsel here was "presented with express statements of the client's will to maintain innocence," yet unconstitutionally chose to "steer the ship the other way." McCoy, 138 S.Ct. at 1509.
When a client expressly asserts that the objective of 'his defence' is to maintain innocence of the charged criminal acts, his lawyer must abide by that objective and may not override it by conceding guilt.
Id. (emphasis added). Counsel's unauthorized continuation of his concession strategy tactically vetoed Appellant's choice of ultimate defense objectives in violation of a clearly established right to the assistance of counsel for "his defense." McCoy, 138 S.Ct. at 1511-12 (emphasis added). The convictions should be reversed.
¶24 It seems practically important to mention what this does not mean: There was nothing professionally deficient about counsel's initial decision to pursue a concession strategy, and nothing inherently improper in the rhetoric of his closing argument. But the Sixth Amendment protected Appellant's decision to change his mind at the close of the prosecution's case, to take the stand, and to maintain his innocence, even in the teeth of his previous agreement with counsel.
¶25 Though the potential difficulty that a client's change of ultimate objectives might cause for trial counsel is not hard to imagine, the actual difficulty in this case would have been relatively minimal. Counsel had not made a concession of guilt in voir dire or opening statement. He had conducted minimal cross-examination in the prosecution's case-in-chief. This was not a situation where counsel's prior statements to the jury had passed some tactical point of no return. See e.g., Grissom v. State, 2011 OK CR 3, ¶¶ 30-32, 253 P.3d 969, 980-81 (finding counsel effectively conceded defendant's guilt of murder by telling prospective jurors in voir dire that there was "no question" of defendant's guilt).
¶26 Appellant's change of objectives thus presented no real ethical or strategic dilemma for counsel in closing argument. The unenviable task of arguing against strong evidence without conceding guilt can be difficult, but it was not impossible here. Counsel could have maintained credibility with jurors in his closing argument by emphasizing uncontested principles of law and fairness: the presumption of innocence; the State's burden to prove guilt beyond a reasonable doubt; Appellant's right to have his trial testimony considered along with that of other witnesses; and the importance of a fair and impartial verdict. Even these possible lines of first-stage argument are only hypothetical. Given counsel's sentencing-stage strategy, he might well have tactically waived his first-stage closing and avoided the risk of constitutional error entirely.
¶27 Finally, this case pointedly illustrates the importance of counsel's compliance with the pre-concession procedure promulgated in Jackson v. State, 2001 OK CR 37, ¶ 25, 41 P.3d 395, 400. Counsel's failure to disclose his concession plan to the trial court before closing argument resulted in the failure to preserve a better record of having obtained the client's essential consent. Counsel's non-compliance with Jackson made a post-trial attack on the concession much more likely, and its ultimate resolution far more difficult.
¶28 I am authorized to state that Vice Presiding Judge Kuehn joins in this dissent.
FOOTNOTES
[1] Trial counsel had acknowledged as much when he made his first-stage closing, and again in the sentencing stage, where he acknowledged that "my trial strategy" had upset the defendant and his family. "But I'm not going to be disingenuous to the jury and argue evidence that doesn't exist, things that don't make sense. This entire trial from the beginning has been a sentencing trial. It wasn't a trial about guilt or innocence." (emphasis added). 
[2] By saying, at the very beginning of the speech, for instance, "Friends, Romans, Countrymen, lend me your ears. I come to bury Caesar, not to praise him." Of course, Antony intended precisely the opposite, but could not openly admit the aims of his speech before Caesar's assassins. The Tragedy of Julius Caesar, III.2.75 (emphasis added); and later: "I have o'ershot myself to tell you of it [the bequests to Roman citizens in Caesar's will]; I fear I wrong the honorable men whose daggers have stabbed Caesar; I do fear it," III.2.150-52, and many other instances besides therein. The Complete Pelican Shakespeare 1321-22 (Penguin, 2002).
[3] M. T. Cicero, "Pro Caelio," in Cicero, Defense Speeches 129-161, D.H. Berry, transl., (Oxford World's Classics, 2000)
[4] See www.merriam-webster.com/dictionary/apophasis (visited July 1, 2019).





 Citationizer© Summary of Documents Citing This Document
 
 
 
 Cite
 Name
 Level
 
 
 
 None Found.
 
 
 Citationizer: Table of Authority
 
 
 
 Cite
 Name
 Level
 
 
 
 
 2018 OK CR 7, DAVIS v. STATE
Cited
Oklahoma Court of Criminal Appeals Cases
 Cite
Name
Level

 1988 OK CR 73, 753 P.2d 388, DAVIS v. STATE
Discussed
 1988 OK CR 124, 758 P.2d 324, MUNSON v. STATE
Discussed
 1989 OK CR 52, 779 P.2d 580, FOWLER v. STATE
Discussed
 1994 OK CR 72, 885 P.2d 665, DAVIS v. STATE
Discussed
 1996 OK CR 14, 915 P.2d 932, KANE v. STATE
Discussed
 1996 OK CR 59, 929 P.2d 270, Al-Mosawi v. State
Discussed
 2001 OK CR 37, 41 P.3d 395, 73 OBJ 9, JACKSON v. STATE
Discussed at Length
 2002 OK CR 30, 53 P.3d 418, LOCKETT v. STATE
Discussed
 2004 OK CR 27, 98 P.3d 318, LOTT v. STATE
Discussed
 2004 OK CR 31, 100 P.3d 1017, DODD v. STATE
Discussed
 2004 OK CR 35, 103 P.3d 590, GARRISON v. STATE
Discussed
 2007 OK CR 38, 169 P.3d 1198, THOMPSON v. STATE
Discussed at Length
 2010 OK CR 6, 230 P.3d 888, SIMPSON v. STATE
Discussed at Length
 2011 OK CR 3, 253 P.3d 969, GRISSOM v. STATE
Discussed
 2012 OK CR 5, 272 P.3d 720, JOHNSON v. STATE
Discussed
 2012 OK CR 15, 290 P.3d 759, BARNARD v. STATE
Cited
 2013 OK CR 8, 303 P.3d 291, DAY v. STATE
Discussed
 2016 OK CR 9, 372 P.3d 508, STEWART v. STATE
Discussed
 2016 OK CR 27, 387 P.3d 956, LUNA v. STATE
Discussed at Length
 2016 OK CR 30, 400 P.3d 775, FULGHAM v. STATE
Discussed
 2017 OK CR 16, 400 P.3d 875, BAIRD v. STATE
Discussed
 2017 OK CR 23, 406 P.3d 30, WILLIS v. STATE
Discussed at Length
 2018 OK CR 7, 419 P.3d 271, DAVIS v. STATE
Cited
 2018 OK CR 8, 419 P.3d 283, LAMAR v. STATE
Discussed at Length
 2018 OK CR 20, 423 P.3d 617, TRYON v. STATE
Discussed at Length
 2019 OK CR 7, 442 P.3d 154, MARTINEZ v. STATE
Discussed
 2019 OK CR 12, 443 P.3d 579, MOORE v. STATE
Discussed
 2019 OK CR 13, 443 P.3d 573, LAVORCHEK v. STATE
Discussed at Length
 2019 OK CR 15, 446 P.3d 1248, TAFOLLA v. STATE
Cited
 2019 OK CR 20, 449 P.3d 873, DETWILER v. STATE
Discussed at Length
 2019 OK CR 22, 450 P.3d 933, HARRIS v. STATE
Discussed at Length
 2020 OK CR 4, FUSTON v. STATE
Cited
 2000 OK CR 4, 994 P.2d 61, 71 OBJ 418, Stemple v. State
Discussed
 1982 OK CR 23, 640 P.2d 1377, BOONE v. STATE
Discussed
 1983 OK CR 12, 657 P.2d 662, REED v. STATE
Discussed
 1997 OK CR 35, 942 P.2d 736, CLEARY v. STATE
Discussed at Length
 1999 OK CR 10, 990 P.2d 253, 70 OBJ 870, Van White v. State
Discussed
 1999 OK CR 12, 989 P.2d 945, 70 OBJ 946, C.L.F. v. State
Discussed
 1984 OK CR 39, 676 P.2d 842, RUSHING v. STATE
Discussed
 1986 OK CR 104, 721 P.2d 820, ROGERS v. STATE
Discussed
 1987 OK CR 31, 733 P.2d 1342, YBARRA v. STATE
Discussed
Title 12. Civil Procedure
 Cite
Name
Level

 12 O.S. 2107, Remainder of Part of Record - Other Records
Cited
 12 O.S. 2404, Character Evidence Not Admissible to Prove Conduct - Exceptions - Other Crimes
Cited
 12 O.S. 2608, Evidence of Character and Conduct of Witness
Cited
 12 O.S. 2804, Hearsay Exception - Declarant Unavailable
Discussed at Length
Title 20. Courts
 Cite
Name
Level

 20 O.S. 3001.1, Setting Aside Judgment on Ground of Misdirection of Jury or Error in Pleading or Procedure
Cited
Title 21. Crimes and Punishments
 Cite
Name
Level

 21 O.S. 13.1, Required Service of Minimum Percentage of Sentence - Offenses Specified
Cited
 21 O.S. 856.3, Gang-Related Offense as Condition of Membership in Criminal Street Gang - Penalty
Discussed at Length
 21 O.S. 11, Specific Statutes in Other Chapters as Governing - Acts Punishable in Different Ways
Cited
 21 O.S. 652, Shooting with Intent to Kill - Assault and Battery with Deadly Weapon, etc.
Cited
 21 O.S. 701.7, Murder in the First Degree
Cited
 21 O.S. 701.9, Punishment for First Degree Murder - Penalty for Second Degree
Cited
 21 O.S. 856, Delinquent Minor - Contributing to Delinquency
Cited
Title 22. Criminal Procedure
 Cite
Name
Level

 22 O.S. 258, Preliminary Examinations and Proceedings Thereon
Cited


 
 








 
 
 
 

 
 

 
 
 
 oscn
 
 EMAIL: webmaster@oscn.net
 Oklahoma Judicial Center
 2100 N Lincoln Blvd.
 Oklahoma City, OK 73105
 
 
 courts
 
 Supreme Court of Oklahoma
 Court of Criminal Appeals 
 Court of Civil Appeals
 District Courts
 
 
 
 decisions
 
 New Decisions
 Supreme Court of Oklahoma
 Court of Criminal Appeals
 Court of Civil Appeals
 
 
 
 programs
 
 The Sovereignty Symposium
 
 Alternative Dispute Resolution
 Early Settlement Mediation
 Children's Court Improvement Program (CIP)
 Judicial Nominating Commission
 Certified Courtroom Interpreters
 Certified Shorthand Reporters
 Accessibility ADA
 
 
 
 
 
 
 
 
 Contact Us
 Careers
 Accessibility ADA